**Opinion issued February 21, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-17-00604-CR**

———————————

**DAVION GRIFFIN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 185th District Court**
**Harris County, Texas**
**Trial Court Case No. 1494454**

---

**O P I N I O N**

A jury found Davion Griffin guilty of the offense of capital murder, and the trial court assessed his punishment at life imprisonment. In three issues, Griffin contends that the trial court erred in (1) refusing to instruct the jury to consider

whether a certain witness was an accomplice-witness and (2) denying his motions for mistrial for improper jury argument.

We conclude that the trial court's decision to not include an accomplice-witness instruction in the jury charge was not in error. We further conclude that the trial court did not abuse its discretion in denying Griffin's motions for mistrial.

We therefore affirm.

## Background

In the early morning hours of June 20, 2012, the complainant, Coy Thompson, a.k.a "Poppa C," who was a member of the street gang the Forum Park Crips, was gunned down in the parking lot of a southwest Houston nightclub where he had just attended a rap concert.

Minutes after the shooting, Houston Police Department ("HPD") Officer W. Reyes was dispatched to the strip center at 9850 Westpark where the nightclub Scores (also called Hottyz) was located. He arrived to find EMS, fire department personnel, and other officers responding to a "very out of control" scene, with "over a hundred people, easily, running around, frantic, chaotic," and the deceased bodies of the complainant (Poppa C), Carlos "Dinky" Dorsey, and Erica Dotson. Officer Reyes was unable to locate any eye witnesses to the shooting. He did, however, collect eighteen fired .40 caliber Smith & Wesson bullet casings. Also collected at the scene were three baseball caps and the complainant's cell phone.

2

HPD Sergeant C. Cegielski, who was part of the homicide division's gang murder squad, was assigned to the case. At trial, he testified that at the time of the shooting, the HPD had been investigating the complainant's possible involvement in the January 2012 murders of Bellfort Bloods street gang members, Tremaine Burnett and Tre Bush, and that he immediately theorized that the complainant's shooting may have been in retaliation for these murders.

In the hours after the shooting, Sergeant Cegielski interviewed several witnesses, but none could identify the shooter. A few weeks later, however, an eyewitness identified Efeany Uvukansi, a.k.a. "E-Funny," as the shooter, and he was charged on July 3, 2012 with the capital murder of all three of the decedents.

E-Funny is a member of the street gang MWG, or "M-Dub-G," which stands for "Most Wanted Gangsters," and is affiliated with the nation-wide street gang, the Bloods. Locally, MWG is associated and shares members with street gangs the Taliban and the Bellfort Bloods. Notably, Tremaine Burnett and Tre Bush were members of the Bellfort Bloods, and Griffin was a member of MWG and/or the Bellfort Bloods. These gangs are considered to be rivals of the Forum Park Crips, of which the complainant was rumored to be the leader.

Several days after E-Funny was charged with capital murder, Sergeant Cegielski received Houston Forensic Science Center firearms examiner K. Zeller's lab report, concluding that the 18 bullet casings collected at the scene were fired

from two different firearms. Sergeant Cegielski continued his investigation, and on September 19, 2012, he interviewed Griffin. Although the interview was not recorded, Sergeant Cegielski testified at trial that Griffin denied having been at the scene the morning of the shooting, denied knowing E-Funny, and stated that he only knew "of" Dexter Brown, another witness in the investigation.

During the interview, Sergeant Cegielski was able to verify Griffin's cell phone number. Having already obtained cell phone records for E-Funny and Brown, Sergeant Cegielski searched those records for Griffin's cell phone number, and discovered 85 calls between E-Funny and Griffin between June 3–July 3 2012, including on the day of the shooting, and 170 calls between Brown and Griffin from May through July 2012.

Photographs extracted from E-Funny's cell phone and admitted into evidence as State's Exhibits 80–85 show Griffin, E-Funny, Brown, Anthony "Tutu" Jones, and others celebrating. The photographs were taken beginning an hour after the shooting and ending at 10:28 p.m. In some of the photographs, E-Funny and possibly Griffin are "throwing the dub," or "the west," which are hand gestures for the gang MWG. All but one[1] of the people depicted in the photographs are members of at least one of the related gangs MWG, the Taliban, or the Bellfort Bloods.

---

[1] Anthony Jones is a Crip.

Sergeant Cegielski testified that, because the interview was inconsistent with the call records and photographs extracted from E-Funny's and Brown's cell phones, he re-interviewed Griffin on November 29, 2012. An audio recording of the interview was admitted as Exhibit 130 and published to the jury. Sergeant Cegielski noted that, in the recording, Griffin distanced himself from E-Funny, asking, "Is that the dude from the news?" He claimed that he did not really know E-Funny and would have had "no reason to hang out" with him. Sergeant Cegielski also noted that, when shown the photographs from E-Funny's cell phone taken just after the shooting, Griffin "sound[ed] surprised that he's standing in the middle." But by the end of the interview, Griffin admitted that he knew the people in the photographs and that he would "chop it up" with them.

In the recorded interview, Griffin can also be heard denying that he lived in the apartment where the photographs were taken at the time of the incident. This conflicts with the testimony of several trial witnesses, including Griffin's girlfriend Briana Hunter, who stated that she and Griffin lived together in the apartment at the time of the post-shooting celebration.

Almost exactly three years after Griffin's recorded interview, MWG gang member Kelsey Manning, a.k.a. "Smoke," who was in federal custody awaiting sentencing after pleading guilty to the charge of felon in possession of a firearm, came forward as an eye-witness to the shooting. Manning was not charged in this

case, but as a result of the information he provided, Griffin was charged with the complainant's murder.

At trial, Manning testified that, by June of 2012, he and his MWG associates were "very angry" at the complainant and "wanted him dead," because they held him responsible for the deaths of fellow gang members Tre Bush and Tremaine Burnett. Manning further testified that, in 2011, Griffin was shot "over drugs," and that MWD held the complainant responsible for that as well.

According to Manning, MWG gang member "Stiff Sean," whose family managed the nightclub at 9850 Westpark, informed MWG that the complainant would be at the nightclub attending a rap concert on the night of June 19, 2012. Manning went, unarmed, to the nightclub to watch the complainant "get killed." He arrived in the parking lot of 9850 Westpark just as the concert was ending. He walked over to Stiff Sean, and while the two were talking, he noticed Griffin standing against the wall of the nightclub. He began to approach Griffin to greet him, but Griffin put his hand up "like a stop sign," "to, like, stop, like, to hold off, like I'm drawing attention to him or something." Manning then saw Griffin run toward the complainant, firing his gun at him twice. The complainant took off running and hid behind Dinky. Manning saw Griffin shoot Dinky in the head. He also saw E-Funny shoot at the complainant.

Manning further testified that, although he did not feel he was in any danger, he dropped to the ground, "covering" himself. The following exchanges then occurred:

> [State]: So, why did you go down to the ground if you don't believe yourself to be in any danger?
>
> [Manning]: To play my position, play my role, like I know it was something I didn't know what was going on.
>
> [State]": So, you're, in all honesty, trying to act like an innocent bystander out there but you actually know who the intended target is?
>
> [Manning]: Yes, ma'am.
>
> . . . .
>
> [Defense counsel]: You went over there knowing that some sort of attempt was going to be made on Poppa C's life, correct?
>
> [Manning]: Yes, sir.
>
> [Defense counsel]: And you had a role to play in that particular venture, that particular enterprise or that particular attempt. You had a role to play, to act as an innocent bystander? Is that what you said?
>
> [Manning]: Yes, sir.
>
> [Defense counsel]: Did everybody have a role to play?
>
> [Manning]: No, sir. I just know as far as me.
>
> [Defense counsel]: That—but you felt you had a role to play?
>
> [Manning]: Yes, sir, due to me being a active and known gang member of the—of my organization, yes, I felt like I had to play a[n] innocent role.

7

Manning testified that while taking cover on the ground, he continued to hear gunshots, but did not see Griffin shoot the complainant. When the shooting ended, Griffin ran away and Manning went to the apartment where Griffin and Hunter lived.

The State showed Manning some of the photographs taken just after the shooting on E-Funny's cell phone. Manning identified Griffin, Jones, Brown, E-Funny, and others, some of whom were making hand gestures of gang signs, which Manning described as "throwing up the dub . . . as a celebration . . . of what just happened."

Manning stated that at the celebration, Griffin said that he shot Dinky because the complainant was hiding behind Dinky. He also stated that Griffin indicated that he used a .40 caliber weapon.

Finally, Manning testified regarding his own criminal record. He stated that he had been convicted of aggravated robbery, engaging in organized criminal activity, burglary of a habitation, and possession of a controlled substance. Manning also explained that he hoped to receive a reduced sentence in his federal case in exchange for his testimony. More specifically, he stated that he agreed to testify in this case in exchange for the Assistant U.S. Attorney's recommendation of a downward departure in his sentencing, with the understanding that, even with the recommendation, "the full range would still be from zero years all the way up to life

8

in prison," and that "the judge can take anything the Assistant U.S. Attorney says into account or . . . disregard it completely."

Jones also testified at trial, but he did so under subpoena. He acknowledged that he was not entirely truthful in his first and second interviews with HPD detectives, but that by his third interview, he had "come clean." Jones testified that when he arrived at the nightclub toward the end of the concert on the morning of the shooting, he saw E-Funny outside. Inside the nightclub, he saw Griffin, heard him say "RIP T-Pain,"[2] watched him walk "straight out the door," and then heard "multiple gunshots," at which point he took off running.

Jones left the scene and went to a gas station, where Griffin arrived in a Honda with E-Funny and Brown. Next, they all went to Hunter's apartment, where they took photographs. Jones identified himself, Griffin, E-Funny, and others in the photographs from E-Funny's cell phone taken just after the shooting. Jones also testified that he had previously told police that Griffin stated that he had used a .40 caliber gun that night.

Hunter testified that, at the time of the incident, she and Griffin lived together in the apartment where Griffin, E-Funny, and other gang members met just after the shooting to celebrate the complainant's murder. She also testified that, at that time,

---

[2]     In its statement of facts, the State characterizes "RIP T-Pain" as "an apparent reference to Tremaine Bennett." Griffin does not dispute this characterization.

9

she owned a dark-colored Honda Civic, which she allowed Griffin to use "whenever he wanted."

Finally, several witnesses testified regarding an incident that took place while Griffin was confined in the Harris County jail. While awaiting trial in this case, Griffin was caught secreting a cell phone and charger. Harris County District Attorney's Office Investigator J. Pietsch used data extracted from the cell phone to find a Facebook page Griffin created while in jail. The profile name for the Facebook page was Tremaine Livethrume, which Investigator Pietsch opined was a reference to Tremaine Burnett, one of the two Bellfort Bloods whom MWG gang members believed the complainant murdered in early 2012.

The trial court admitted a Facebook Live video posted to the page as State's Exhibit 127, and the State published it to the jury. In it, Griffin says, "TOA, Taliban or ambulance." Investigator Pietsch testified that in street slang, this means "either you ride with us, Taliban, or we'll put you in an ambulance." Griffin also references E-Funny, and motions "the trigger pull," saying, "trained assassins."

Griffin did not present any evidence, and both sides rested. At the charge conference, Griffin objected to the jury charge because it did not ask the jury to consider whether Manning was an accomplice as a matter of fact to the complainant's murder. The trial court denied the objection.

10

## Accomplice-Witness Instruction

In his first issue, Griffin argues that the trial court erred in refusing to instruct the jury to consider whether Manning was an accomplice as a matter of fact,[3] because there was some evidence to support his accomplice-witness status. *See* TEX. CODE CRIM. PROC. art. 38.14. He further argues that he suffered some harm because it is possible that the jury convicted him based solely on Manning's uncorroborated testimony. *See id.*

### A. Standard of Review

We review a trial court's decision to deny a requested accomplice-witness jury instruction for an abuse of discretion. *Delacerda v. State*, 425 S.W.3d 367, 395 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *see also Paredes v. State*, 129 S.W.3d 530, 538 (Tex. Crim. App. 2004). A trial court abuses its discretion only if its decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008).

---

[3] Griffin makes no argument that Manning was an accomplice as a matter of law. *See Zamora v. State*, 411 S.W.3d 504, 510 (Tex. Crim. App. 2013) ("A witness is an accomplice as a matter of law when the witness has been charged with the same offense as the defendant or a lesser-included offense, or 'when the evidence clearly shows that the witness could have been so charged.'" (quoting *Cocke v. State*, 201 S.W.3d 744, 747–48 (Tex. Crim. App. 2006)).

If we find that the trial court abused its discretion, we must then determine whether denial of the instruction caused sufficient harm to warrant a reversal. *Druery v. State*, 225 S.W.3d 491, 504 (Tex. Crim. App. 2007). The degree of harm necessary for reversal depends upon whether the error was preserved. *Id.* If, as here, the error has been properly preserved by an objection or request for instruction, reversal is required if the appellant has suffered "some harm." *Id.* In other words, any harm, regardless of degree, is sufficient to require reversal. *Id.* If there is non-accomplice evidence connecting the defendant to the offense, failure to submit an accomplice-witness instruction may be rendered harmless. *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002).

## B.     Applicable Law

Under article 38.14 of the Code of Criminal Procedure, a criminal conviction may not be based on the testimony of an accomplice witness unless the testimony is "corroborated by other evidence tending to connect the defendant with the offense committed." TEX. CODE CRIM. PROC. art. 38.14. A witness is an accomplice only if he participates in the crime with the defendant, taking "an affirmative act . . . to assist in the commission of the [crime]" before, during, or after the commission of the crime, with the required culpable mental state for the crime. *Druery*, 225 S.W.3d at 498–99. Mere presence at the scene of the crime does not render a witness an accomplice. *Id.* at 498; *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006).

Nor is a witness an accomplice merely because he knew of the crime and failed to disclose it or even concealed it. *Druery*, 225 S.W.3d at 498. There must exist evidence sufficient to connect the witness to the criminal offense as a "blameworthy participant." *Cocke*, 201 S.W.3d at 748 (quoting *Blake v. State*, 971 S.W.2d 451, 455 (Tex. Crim. App. 1998)).

"A witness may be an accomplice either as a matter of law or as a matter of fact; the evidence in a case determines what jury instruction, if any, needs to be given." *Cocke*, 201 S.W.3d at 747. "Whether an accomplice-witness instruction is justified, therefore, requires a case-specific and fact-specific inquiry." *Id.* at 748. "When the evidence clearly shows (i.e., there is no doubt) that a witness is an accomplice as a matter of law, the trial judge must instruct the jury accordingly." *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). For example, a witness who is indicted for the same offense or a lesser-included offense as the defendant is an accomplice as a matter of law. *Id.* But when the evidence is conflicting and it remains unclear whether the witness is an accomplice, the trial court should allow the jury to decide the issue as a matter of fact under instructions defining the term "accomplice." *Druery*, 225 S.W.3d at 498–99; *Paredes*, 129 S.W.3d at 536. Finally, when the evidence clearly shows that a witness is not an accomplice, the trial judge is not obliged to instruct the jury on the accomplice-witness rule—as a matter of law or fact. *Smith*, 332 S.W.3d at 440.

## C. Analysis

Griffin argues that the following evidence entitled him to an accomplice-witness-as-a-matter-of-fact instruction: (1) Manning knew that MWG was planning to kill the complainant; (2) Manning was present at the club with Griffin when the crime occurred; (3) the murder was gang-motivated, and both Manning and Griffin were members of MWG; (4) when Griffin signaled to him not to approach, Manning complied; (5) Manning went to the ground when Griffin fired at the complainant, pretending he was unaware of what was happening; (6) Manning met with other members of MWG after the shooting to celebrate their efforts; and (7) Manning had been previously convicted of engaging in organized criminal activity. We disagree.

"Merely being present at the crime, having knowledge of the planned offense but failing to disclose it, and even concealing the offense does not turn a witness into an accomplice witness." *Delacerda*, 425 S.W.3d at 396; *see also Druery*, 225 S.W.3d at 498 ("The mere presence of [witnesses] at the scene of the crime does not render either an accomplice witness, and neither [of the two witnesses] is an accomplice witness merely because he or she knew of the planned offense but did not disclose it."); *Paredes*, 129 S.W.3d at 537–38 ("Although [witness] may have suspected that foul play would occur when [defendant] arrived at her house, there is no evidence suggesting that she assisted in the preparation for or planning of the

14

murders. [She] was not susceptible to prosecution for capital murder or a lesser-included offense.").

Similarly, Manning's status as a member of MWG even combined with his presence at the scene is not enough to support submission of an accomplice-witness question to the jury. *See Medina v. State*, 7 S.W.3d 633, 641–42 (Tex. Crim. App. 1999) (defendant's fellow gang member who was present when defendant committed offense was not accomplice witness); *Valadez v. State*, No. 13-02-036-CR, 2002 WL 34231214, at *4 (Tex. App.—Corpus Christi Oct. 10, 2002, pet. ref'd) (not designated for publication) ("Gang membership, even if combined with presence at the scene of a crime and/or concealment of a crime, is not necessarily sufficient to support a finding of accomplice status."); *see also Garcia v. State*, No. 13-10-00098-CR, 2011 WL 861156, at *5 (Tex. App.—Corpus Christi Mar. 10, 2011, no pet.) (mem. op., not designated for publication) ("[M]embership in a gang, without evidence that the person participated or assisted in the commission of the crime, is not sufficient to support a finding of accomplice status.").

Nor is the fact that Manning had been previously convicted of engaging in organized criminal activity. *Druery*, 225 S.W.3d at 498 ("[C]omplicity with an accused in the commission of another offense apart from the charged offense does not make that witness's testimony that of an accomplice witness."); *Garcia*, 2011 WL 861156, at *5 ("participating in other gang-related criminal acts having nothing

to do with the charged offense" does not makes witness an accomplice); *Valadez*, 2002 WL 34231214, at *4 (witness who had participated in another homicide involving defendant and gang not accomplice as a matter of law or fact).

Even the combined force of the above-discussed evidence of his knowledge, gang affiliation, and presence at the scene is insufficient to create a fact issue as to whether Manning was a "blameworthy participant" whose testimony supports submission of the accomplice-witness question to the jury. *See Cocke*, 201 S.W.3d at 748 (requiring evidence witness was blameworthy participant). More is needed: there must be some evidence that he performed an "affirmative act" to assist in the commission of the murder. *See Paredes*, 129 S.W.3d at 536 (witness must have engaged in affirmative act that promoted crime to warrant accomplice-witness instruction); *Kunkle v. State*, 771 S.W.2d 435, 441 (Tex. Crim. App. 1986) (["T]here must be some evidence of an affirmative act by the witness committed to assist in commission of the offense before that witness may be considered an accomplice."); *see also Valadez*, 2002 WL 34231214, at *4 (witness who drove fellow gang member to victim's apartment days before murder, knew of another gang member's intent to kill victim because of power struggle within gang, and had participated in another homicide involving defendant and gang, not accomplice as matter of law or fact because he made no affirmative act to promote commission of offense of engaging in organized criminal activity).

16

Griffin argues that Manning acted affirmatively to promote the murder when he complied with Griffin's signal not to approach him. According to Griffin, this facilitated the shooting by not drawing attention to Griffin. But Manning's keeping away from Griffin does not qualify as an affirmative act. Indeed, it is not an act at all, but is more akin to an omission, such as failure to warn the victim or to disclose knowledge that a crime is going to be committed, neither of which constitute affirmative acts to promote a crime. *See, e.g.*, *Kunkle*, 771 S.W.2d at 439–41 (concluding there was no evidence witness performed affirmative act in robbery and murder of victim, "[e]ven if [he] knew about the prior robbery, failed to abandon the group, permitted [victim] to be induced into entering the vehicle, and would have told the others (but did not) if he saw police"); *Easter v. State*, 536 S.W.2d 223, 225 (Tex. Crim. App. 1976) (witness who "had guilty knowledge of the offense and did not timely disclose it" not accomplice); *Delacerda*, 425 S.W.3d at 396 (neither presence at scene, nor failure to disclose knowledge of planned offense, nor concealing offense "turn a witness into an accomplice witness"); *Lane v. State*, 991 S.W.2d 904, 907 (Tex. App.—Fort Worth 1999, pet. ref'd) (witness who was present "during the entire series of events" and "knew full well what the other three actors were doing," but did not stop crime or alert anyone "committed no affirmative act in furtherance of the crime," because she did not act but rather, omitted to act); *see also Mendoza v. State*, No. 01-13-00146-CR, 2014 WL 3045194, at *3 (Tex. App.—

17

Houston [1st Dist.] July 3, 2014, pet. ref'd) (mem. op., not designated for publication) (witnesses who knew defendant had shotgun and planned to assault victim, but did not warn him "not accomplice witnesses to murder or assault, because they committed no affirmative act to assist"); *Rios v. State*, No. 2-04-543-CR, 2006 WL 1101841, at *4 (Tex. App.—Fort Worth Apr. 27, 2006, pet. ref'd) (mem. op., not designated for publication) (witness who "threw gang signs" at members of street gang with whom defendant fought and later shot, was in car with defendant at time of shooting, did nothing to prevent or stop shooting despite knowing what was about to happen, and withheld information from police, not accomplice); *Valadez*, 2002 WL 34231214, at *4 (witness who drove fellow gang member to victim's apartment days before murder, knew of another gang member's intent to kill victim because of power struggle within gang, and had participated in another homicide involving defendant and gang, not accomplice because he made no affirmative act to promote commission of offense of engaging in organized criminal activity); *Bethle v. State*, No. 09-96-393 CR, 1997 WL 536707, at *1 (Tex. App.—Beaumont Aug. 27, 1997, pet ref'd) (not designated for publication) (witness who knew offense was going to be committed and did not warn victim did not "affirmatively act[] to promote the murder," as his "failure to prevent the murder does not make him an accomplice").

Similarly, hitting the ground pretending to be unaware of what was happening does not rise to the level of an affirmative act to assist in the commission of the

murder. Manning's testimony reflects that he went to the nightclub to observe the crime, rather than to further its commission by fulfilling a "role"[4] of dropping to the ground. By his act, Manning merely continued to play the role of an unwitting bystander as the events unfolded. Concealing knowledge of a crime as it occurs falls short of participation. *See Easter*, 536 S.W.2d at 225 ("The fact that a person who is present when a crime is committed fails to give an alarm . . . does not make him an [accomplice]." (quotation omitted)); *cf. Tran v. State*, 870 S.W.2d 654, 657–58 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd) (defendant entitled to accomplice-in-fact instruction where witness knew defendant and his group planned to shoot at least one person and did not disclose plans, went to crime scene, and did not seek medical help for his wounds after the shooting, and there was evidence that he may have made affirmative act "by preventing members of [defendant]'s group from escaping").

Finally, Manning's attendance at the get-together after the shooting was not an affirmative act done to promote it. *See McCallum v. State*, 311 S.W.3d 9, 14 (Tex. App.—San Antonio 2010, no pet.) (disposing of evidence "do[es] not make [witness] an accomplice to the offense of criminally negligent homicide—there is no evidence he did anything to promote the attack that led to [victim]'s death");

---

[4] Manning clarified this testimony, explaining that he dropped to the ground to act as if he "didn't know what was going on."

*Garcia*, 2011 WL 861156, at *7 ("[Witness] admitted that a meeting was held at his house after the shooting to discuss whether the shooters violated the rules of the Mexican Mafia. However, this evidence is not sufficient to prove that [witness] was an accomplice witness—it does not prove that [he] affirmatively assisted in the shooting. . . .").

We conclude that the evidence did not raise a fact issue regarding whether Manning engaged in an affirmative act promoting the commission of the murder. *See Delacerda*, 425 S.W.3d at 396 ("We conclude that the evidence did not raise a fact issue regarding whether [witnesses] engaged in an affirmative act promoting the commission of the offense or whether they acted with the required culpable mental state. We therefore hold that the trial court correctly denied [defendant]'s requested jury instruction that included [witnesses] as accomplice witnesses."); *Garcia*, 2011 WL 861156, at *7 ("The evidence is not conflicting or unclear regarding [witness]'s status as an accomplice because there was no evidence showing that [he] committed an affirmative act in order to assist or promote the shooting . . . .").

We overrule Griffin's first issue.

## Improper Jury Argument

In his second and third issues, Griffin argues that the trial court abused its discretion in denying his motions for mistrial for improper jury argument regarding

the unsubmitted theory of conspiracy and the benefit Manning anticipated receiving for his testimony.

**A. Standard of Review and Applicable Law**

When, as here, the trial court instructs the jury to disregard improper argument, the proper analysis is whether the trial court abused its discretion in denying the defendant's motion for mistrial. *Archie v. State*, 340 S.W.3d 734, 738–39 (Tex. Crim. App. 2011) ("Because the trial court sustained the appellant's objection and instructed the jury to disregard the argument, '[t]he only adverse ruling—and thus the only occasion for making a mistake—was the trial court's denial of the motion for mistrial.' Thus, 'the proper issue is whether the refusal to grant the mistrial was an abuse of discretion.'" (quoting *Hawkins v. State*, 135 S.W.3d 72, 76–77 (Tex. Crim. App. 2004)). Under this standard, we view the evidence in the light most favorable to the trial court's ruling and uphold the ruling if it falls within the zone of reasonable disagreement. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009); *Torres v. State*, 424 S.W.3d 245, 260 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd).

"A mistrial is an extreme remedy and should be exceedingly uncommon." *Williams v. State*, 417 S.W.3d 162, 175 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (citing *Hawkins*, 135 S.W.3d at 77 (a mistrial is required only "in extreme circumstances, where the prejudice is incurable"))). It is required only when the

impropriety is "clearly calculated to emotionally inflame the jurors' minds and is of such a character as to suggest the impossibility of withdrawing the impression produced on the jurors' minds," or is "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Id.* at 175 (citing first *Hinojosa v. State*, 4 S.W.3d 240, 253 (Tex. Crim. App. 1999), then *Hawkins*, 135 S.W.3d at 77 (quoting *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)); *see also Archie*, 340 S.W.3d at 738–39 ("Mistrial is the appropriate remedy when . . . the objectionable events 'are so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant.'" (quoting *Young v. State*, 137 S.W.3d 65, 71 (Tex. Crim. App. 2004)).

Where, as here, constitutional rights are not implicated,[5] we evaluate whether the trial court abused its discretion in denying a mistrial for improper jury argument by conducting a harm analysis. We do so by weighing the following factors set forth in *Mosley v. State*: "(1) the severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks), (2) the measures adopted to cure the

---

[5] Generally, error involving improper jury argument is non-constitutional. *See Martinez v. State*, 17 S.W.3d 677, 692 (Tex. Crim. App. 2000); *Freeman v. State*, 340 S.W.3d 717, 728 (Tex. Crim. App. 2011). And, while "[a]n 'improper argument may present a Fourteenth Amendment due process claim if the prosecutor's argument so infected the trial with unfairness' as to make the result 'a denial of due process,'" *Thompson v. State*, 89 S.W.3d 843, 852 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (citing *Miller v. State*, 741 S.W.2d 382, 391 (Tex. Crim. App. 1987)), the record before us does not present such a case.

22

misconduct (the efficacy of any cautionary instruction by the judge), and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction)." *Archie*, 340 S.W.3d at 739 (citing *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998)).

A prompt instruction to disregard ordinarily cures any resulting harm. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000); *Williams*, 417 S.W.3d at 172. And, on appeal, we generally presume the jury followed the trial court's instructions. *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005). Thus, a mistrial is required only in those "extreme circumstances" where the prejudice is "incurable." *Hawkins*, 135 S.W.3d at 77.

## B. Waiver

We begin by addressing the State's argument that Griffin waived his second and third issues (that the trial court abused its discretion in denying his motions for mistrial for improper jury argument) due to inadequate briefing. *See* TEX. R. APP. P. 38.1(i) (appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"); *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000) (appellant waives an issue on appeal if he does not adequately brief that issue by presenting supporting arguments and authorities).

According to the State, Griffin did not adequately address the impropriety of the complained-of arguments. But the trial court sustained Griffin's objection to the arguments and instructed the jury to disregard them. Thus, the propriety of the arguments is not the focus of our inquiry. Instead, "we assume without deciding that the argument was improper and look only to whether the trial court abused its discretion when it denied the motion for mistral." *Penix v. State*, No. 10-17-00012-CR, 2018 WL 4624027, at *1 (Tex. App.—Waco Sept. 26, 2018, pet. ref'd) (mem. op., not designated for publication) (citing *Hawkins*, 135 S.W.3d at 76–77); *see also Daniels v. State*, No. 05-06-01363-CR, 2008 WL 444467, at *5 (Tex. App.—Dallas Feb. 20, 2008, pet. ref'd) (mem. op., not designated for publication) (where trial court sustained objection to improper argument and instructed jury to disregard, only appellate issue was whether denial of mistrial was abuse of discretion, not whether argument was improper); *cf. Archie*, 340 S.W.3d at 738–39 (where trial court sustains objection and instructed jury to disregard argument, only ruling for reviewing court to address is trial court's denial of mistrial motion).

In determining whether the trial court erred in denying Griffin's mistrial motion, we conduct a *Mosley* harm analysis, weighing the severity of the misconduct, the efficacy of any curative measures taken by the judge, and the strength of the evidence supporting the conviction. *Archie*, 340 S.W.3d at 739; *Mosley*, 983 S.W.2d at 259. Because Griffin adequately addressed these factors,

24

none of which require him to defend the trial court's antecedent ruling in his favor, he has not waived his second and third issues that the trial court abused its discretion in denying his motions for mistrial for improper jury argument. *See* TEX. R. APP. P. 38.1(i); *Cardenas*, 30 S.W.3d at 393.

## C. Unsubmitted Theory

In his second issue, Griffin argues that the prosecutor improperly "bootstrapped" a conspiracy theory of responsibility into the case, confusing the jury and thus requiring a mistrial. Specifically, he complains of the following remarks:

> Let's talk a little bit about conspiracy. And I know Sarah used an example, I believe, with Jurors No. 6, No. 7 and 8 on the agg[ravated] robbery. You guys remember that? Let's talk about it. So, if in the attempt to commit one felony and in this case –

Griffin interrupted the prosecutor's sentence with an objection, which the trial court sustained. And upon Griffin's request, the trial court instructed the jury to disregard the prosecutor's comments. Griffin then asked for a mistrial, which the trial court denied.

To determine whether the trial court abused its discretion in denying Griffin's mistrial motion, we conduct a *Mosely* harm analysis, first weighing the severity of the misconduct. *See Archie*, 340 S.W.3d at 739; *Mosley*, 983 S.W.2d at 259. Griffin argues that because the prosecutor discussed the concept of conspiracy at voir dire, and Manning's testimony "alluded to a previous discussion among the members of MWG that they would kill [the complainant] if the opportunity presented itself," the

25

prosecutor's prefatory mention of conspiracy constituted severe misconduct. We disagree. At closing, the prosecutor's attempt to define conspiracy was interrupted mid-sentence. Thus, even if the State had intended to argue for a conviction based on conspiracy, it was not given the chance to do so. Any effect this could have had on the jury was negligible. *See Hughes v. State*, 897 S.W.2d 285, 304–05 (Tex. Crim. App. 1994) (prosecutor's comment regarding expert witness's ethics not so inflammatory as to be incurable, because, among other reasons, it was interrupted by appellant's objection and not a complete sentence); *Thomas v. State*, No. 14-95-00354-CR, 1997 WL 367927, at *4 (Tex. App.—Houston [14th Dist.] July 3, 1997, no pet.) (not designated for publication) (prosecutor's argument alleging an extraneous offense not so inflammatory as to be incurable as it was unlikely jury understood prosecutor's inference because of "timeliness of counsel's objection").

Second, we assess the efficacy of any curative measures taken by the trial court, *Archie*, 340 S.W.3d at 739; *Mosely*, 983 S.W.2d at 259, keeping in mind that "[a]lmost any improper argument may be cured by an instruction to disregard." *Williams*, 417 S.W.3d at 175–76 (citation omitted). Here, not only did the trial court immediately instruct the jury to disregard the partial statement, it also included the following language in the jury charge: "You are the exclusive judges of the facts proved, of the credibility of the witnesses and the weight to be given their testimony, but the law you shall receive in these written instructions, and you must be governed

26

thereby." *See Hawkins*, 135 S.W.3d at 84 (analysis of this factor should consider instructions given in jury charge); *Orcasitas v. State*, 511 S.W.3d 213, 224 (Tex. App.—San Antonio 2015, no pet.) (trial court's instruction to jury that only law it should depend on was law in jury charge itself cured improper argument); *Williams*, 417 S.W.3d at 179 (considering as curative measures, that trial court's "written jury instructions again advised the jury that it should not 'consider, discuss, nor relate any matters not in evidence'"); *Durand v. State*, No. 01-05-01148-CR, 2007 WL 2332541, at *17 (Tex. App.—Houston [1st Dist.] Aug. 16, 2007, pet. ref'd) (mem. op., not designated for publication) (given jury charge providing applicable law, State's "less than clear" explanation of law of parties "did not convey to jury that it could convict appellant of capital murder because he had unwittingly helped [co-defendant] commit the crime").

On appeal, we presume the jury followed the trial court's instructions, curing any harm from improper argument. *Thrift*, 176 S.W.3d at 224; *Wesbrook*, 29 S.W.3d at 115–16. Only an extremely inflammatory statement overcomes this presumption. *Williams*, 417 S.W.3d at 176 ("[O]nly in the most egregious cases when there is an 'extremely inflammatory statement' is an instruction to disregard improper argument considered an insufficient response by the trial court." (citation omitted); *accord Wesbrook*, 29 S.W.3d at 116 (only "offensive or flagrant error" incurable). Such is the case only where "the evidence is clearly calculated to inflame the minds

27

of the jury and is of such a character as to suggest the impossibility of withdrawing the impression produced on their minds." *Williams*, 417 S.W.3d at 176 (quoting *Johnson v. State*, 01-07-00461-CR, 2009 WL 1331857, at *4 (Tex. App.—Houston [1st Dist.] May 14, 2009, pet. ref'd) (mem. op., not designated for publication)).

Based on the record before us, we hold that the prosecutor's truncated mention of conspiracy was not so extreme that the trial court's curative instructions were ineffective. *See Moore v. State*, 999 S.W.2d 385, 405–06 (Tex. Crim. App. 1999) (instruction to disregard cured harm from comment on defendant's failure to testify); *Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992) ("We find the uninvited and unembellished reference to appellant's prior incarceration—although inadmissible—was not so inflammatory as to undermine the efficacy of the trial court's instruction to disregard."); *Brown v. State*, 769 S.W.2d 565, 567 (Tex. Crim. App. 1989) (improper argument that jury consider parole law not incurable); *Williams*, 417 S.W.3d at 179 (harm from argument accusing defense counsel of manufacturing evidence not incurable).

The third factor—the strength of the evidence supporting the conviction— also supports a conclusion that the trial court did not abuse its discretion in denying the motion for mistrial. *See Archie*, 340 S.W.3d at 739; *Mosley*, 983 S.W.2d at 259. The record contains compelling evidence of Griffin's guilt, including Manning's eye-witness testimony that Griffin fired his gun at the complainant, and Griffin's

false statements to police denying both his familiarity with E-Funny and Brown (shown to be false by evidence including cell phone records, photographs, and Jones's testimony), and his presence at the nightclub the morning of the shooting (directly contradicted by Manning's and Jones's testimony). *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (inconsistent statements to police and lies about an actor's relationship with accomplice indicative of guilt); *King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (false statements to cover up crime show consciousness of guilt). Griffin's compelling motive to retaliate against the complainant for his supposed involvement in the murders of his fellow-gang members, Tremaine Bennett and Treon Bush, also supports his conviction. *See Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013) (motive is circumstance indicative of guilt). Having reviewed the entire record, we find no indication that the mere mention of the term conspiracy, without explanation or argument, caused the jury such confusion as to undermine Griffin's conviction.

All three of the *Mosley* factors weigh heavily in favor of the State. Accordingly, we hold that the trial court did not abuse its discretion in denying Griffin's motion for mistrial based on the prosecutor's mention of conspiracy during his closing argument.

We overrule Griffin's second issue.

**D. Witness's Anticipated Benefit**

29

In his third issue, Griffin complains that the prosecutor's statement that "[f]ederal judges here in the southern district routinely don't listen to the Assistant US Attorney" implied that Manning would not receive a benefit from testifying, and thus improperly bolstered his credibility so profoundly that a mistrial was required.

We first address the State's argument that Griffin failed to preserve this issue for review because his trial objection does not comport with his argument on appeal. *See* TEX. R. APP. P. 33.1(a)(1) (to preserve error, party must timely object "with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context"). At trial, Griffin objected that the comment went outside the record. *See Freeman v. State*, 340 S.W.3d 717, 728 (Tex. Crim. App. 2011) ("A prosecutor may not use closing arguments to present evidence that is outside the record."). As explained above, because the trial court sustained Griffin's objection and instructed the jury to disregard the prosecutor's improper jury argument, our task on appeal is to determine whether the trial court abused its discretion in denying a mistrial, which requires us to conduct a *Mosley* harm analysis. *Archie*, 340 S.W.3d at 739; *Mosley*, 983 S.W.2d at 259.

In his brief, Griffin argues that the *Mosely* factors compel the conclusion that he was incurably harmed by the prosecutor's outside-the-record comment because it improperly bolstered Manning's credibility by implying that he would not receive a benefit for his testimony. This argument is part of Griffin's *Mosley* harm analysis

30

and is not inconsistent with his outside-the-record objection at trial. *Cf. Archie*, 340 S.W.3d at 738–39 (where trial court sustains objection and instructed jury to disregard argument, only ruling for reviewing court to address is trial court's denial of mistrial motion). Thus, for much the same reason we held above that Griffin did not waive his improper jury argument issues for inadequate briefing, we hold that his outside-the-record objection preserved his challenge to the trial court's denial of his mistrial motion.

Turning to the merits, we again consult the *Mosley* factors to determine whether the trial court abused its discretion in denying Griffin's motion for mistrial. *See Archie*, 340 S.W.3d at 739; *Mosley*, 983 S.W.2d at 259. We begin by assessing the severity of the improper jury argument. *Id.* Here, the prejudicial effect of the prosecutor's reference to a fact not in evidence—that "[f]ederal judges here in the southern district routinely don't listen" to Assistant U.S. Attorneys' sentencing recommendations—was minimal or nonexistent. The comment was not probative of Manning's credibility, as it stopped short of suggesting that Manning was aware of, much less took into consideration in agreeing to testify, the frequency with which judges disregard sentencing recommendations. Further, the jury heard from Manning himself that, although he hoped his testimony would result in a lighter sentence in his federal case, he knew that he could still receive the maximum sentence. And the prosecutor made the complained-of remark immediately after

stating that "certainly [Manning] hopes to receive a benefit. He told you that he hopes that he gets time served . . . . He could still receive up to life in prison." We conclude that it is highly unlikely that the prosecutor's mild attempt to bolster Manning's credibility actually influenced the jury.

The second *Mosley* factor examines the measures taken to cure the misconduct. *See Archie*, 340 S.W.3d at 739; *Mosley*, 983 S.W.2d at 259. Here, the prosecutor's comment was quickly followed by an instruction to disregard, which we presume the jury obeyed. *See Thrift*, 176 S.W.3d at 224; *Wesbrook*, 29 S.W.3d at 115–16. And the trial court took additional curative measures in its charge, which admonished the jury not to "consider, discuss, [n]or relate any matters not in evidence." *See Hawkins*, 135 S.W.3d at 84 (curative measures include instructions given in jury charge). "An instruction to disregard will generally cure error if a prosecutor mentions facts outside the record." *Freeman*, 340 S.W.3d at 727–28. This is so unless the complained-of argument was "so clearly calculated to inflame the minds of the jury or . . . of such a damning character as to suggest it would be impossible to remove the harmful impression from the juror's minds." *Torres*, 424 S.W.3d at 261 (citing *Logan v. State*, 698 S.W.2d 680, 683–84 (Tex. Crim. App. 1985)); *accord Wesbrook*, 29 S.W.3d at 116 (only "offensive or flagrant error" incurable by instruction to disregard). We conclude that the State's remark was not so egregious as to render the instruction to disregard ineffective.

32

Finally, we assess the certainty of Griffin's conviction absent the improper argument. *See Archie*, 340 S.W.3d at 739; *Mosley*, 983 S.W.2d at 259. Griffin argues that the prosecutor's comment was especially harmful because it bolstered the credibility of the State's "main witness." But, as previously discussed, the evidence of Griffin's guilt was overwhelming. And given the irrelevance of the complained-of comment to Manning's credibility, we cannot say that it influenced the jury or had more than a slight effect. Because Griffin's conviction was certain notwithstanding the prosecutor's improper injection of facts not in evidence, the third factor favors the State.

Given the strength of the evidence against Griffin, the trial court's instructions to the jury to disregard, and the minimal likelihood that the comment caused prejudice, we hold that the trial court did not abuse its discretion in denying Griffin's motion for mistrial. *See Archie*, 221 S.W.3d at 700; *Hawkins*, 135 S.W.3d at 85.

We overrule Griffin's third issue.

### Conclusion

We affirm the judgment of the trial court.


Laura Carter Higley
Justice

Panel consists of Justices Keyes, Higley, and Landau.

33

Publish. TEX. R. APP. P. 47.2(b).