Opinion issued July 1, 2025



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-24-00575-CR

_____

**JOURDAN ELLISON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 262nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1646923**

## MEMORANDUM OPINION

Jourdan Ellison was convicted of the capital murder of Christian Lezama, Jr. During trial, because the State intended to call Christian's father, Christian Lezama, Sr., as a next-of-kin witness, the parties agreed he would be permitted to remain in the courtroom during the testimony of other witnesses. After hearing the testimony

of a crime scene investigator, Lezama Sr. recalled that he had found an additional shell casing in his son's apartment, after police had finished their investigation, which he discarded.

The issue in this case is whether the trial court abused its discretion by denying Ellison's request for a mistrial after Lezama Sr. disclosed this information during trial and was permitted to testify about it as a fact witness. We hold that it did not, and we affirm the trial court's judgment of conviction.

## Background

Christian was a rapper who was known throughout the City of Houston. His friends described him as a "flashy" guy, who often wore designer clothes and diamond jewelry. In addition to his rap career, Christian would "[h]ustle on the side"—meaning he would sell marijuana.

On the morning of the shooting, Christian had picked up his best friend Jocson Hernandez. Hernandez testified that Christian was wearing "[e]very piece" of his jewelry that day, including a chain, grill, rings, watch, bracelet, and earrings. After running some errands, the two men returned to Christian's apartment and met up with some friends, Quaron Jones and Jaylen Davis, as well as Ellison, who came to buy drugs from Christian. The group hung out in Christian's apartment for a while playing video games, and then Ellison left to pick up "rillos," i.e., "[l]eaves to roll and smoke . . . [m]arijuana."

2

After about 10 to 15 minutes, Ellison returned to the apartment, alone. Hernandez was still playing video games when Ellison suddenly grabbed Christian's .45 caliber handgun, which was sitting on the coffee table, put it to Hernandez's neck, and told him not to move. Ellison then grabbed Hernandez's handgun (which was a .22 caliber) from Hernandez's hip and pointed it at Christian, Jones, and Davis. Ellison ordered Davis to open the front door to the apartment. Hernandez was on the floor, with Ellison's foot on his head, so he did not see who else entered the apartment. But he heard additional voices. Someone else came over to Hernandez and "[got] on his neck."

Hernandez heard Ellison tell Christian to "come off out of it" and "give [him] the chain" or he would shoot Christian. Christian refused to give up his chain and told Ellison to "chill," and then Hernandez heard them "tussling." The next thing Hernandez remembered hearing was "[f]ive plus" shots fired. Hernandez was still on the floor and when the shots stopped, he got up and saw that Christian had been shot and was bleeding on the ground. Jones called 9-1-1.

Hernandez admitted that he did not see the shooting happen, but he identified Ellison as the person who told Christian to "come off out of it or I'll shoot you," and he knew that Ellison had taken two guns. Hernandez testified that neither Jones nor Davis ever pulled out a firearm or threatened anyone in the apartment.

3

A. Lopez, an assistant medical examiner at the Harris County Institute of Forensic Sciences, testified that Christian suffered four gunshot wounds. One to his back showed "gunpowder stippling," which indicates that it was fired within an "intermediate range of fire"—meaning that the "barrel of the gun had to have been within a couple of feet when he was shot." According to Lopez, this shot was a "lethal injury" and alone could have killed Christian. Lopez further testified that another wound resulted in damage to the liver and right kidney and would have been "very incapacitating." Lopez also testified that one bullet was collected from Christian's body.

K. Wingert, a crime scene investigator with the Houston Forensic Science Center, testified that police officers located eight cartridge casings at the crime scene. Five of those casings were .45 caliber, and three of those casings were 9mm caliber.

C. Bassett, a firearms examiner with the Houston Forensic Science Center, testified that the three 9mm cartridge casings recovered from the scene were fired from the same firearm, a recovered 9mm Luger Glock pistol. Bassett also opined that the five .45-caliber cartridge casings recovered from the scene, as well as the two recovered projectiles, were fired from the same .45-caliber firearm. One of those projectiles was the bullet removed from Christian's body by the medical examiner during his autopsy.

4

Through their investigation, Houston Police Department officers identified three persons of interest: Ellison, Derric Williams, and Michael Sykes. In social media messages admitted at trial, Ellison, Williams, and Sykes communicated about planning the robbery. In these messages, dated the day before the robbery, Ellison described Christian as "green" and stated that he knew "how to get in and out." Houston Police Officer C. Arrington testified that, based on his training and experience, he took this to mean that Ellison considered Christian a "prime target" and that "money could be involved." Ellison stated that Christian "ain't got no gas rn" and "he drive with no guns cause he got that ankle monitor"—meaning that Christian lacked transportation or weapons due to an ankle monitor. Ellison stated that he would "hit him regardless," and he told Williams and Sykes to let him know when they left. Officer Arrington testified that, in this context, to "hit" meant to commit a robbery. On the date of the robbery, Ellison described Christian as "a mark" (i.e., target), told Williams and Sykes to hurry over, and told Sykes they needed "extra hands."

Surveillance footage from the apartment complex and surrounding areas showed that Ellison arrived at Christian's apartment around the same time as a red vehicle and that Williams and Sykes exited that vehicle and walked toward the complex. Surveillance video from the apartment complex, timestamped around the

time of the 9-1-1 call reporting the murder, also showed Ellison, Williams, and Sykes exiting a back stairway. Ellison's shirt appeared to have blood on it.

Ellison was charged with capital murder committed in the course of committing or attempting to commit a robbery. The jury found him guilty and sentenced him to life in prison. This appeal followed.

**Mistrial**

Ellison asserts that the trial court erred by denying his request for a mistrial. According to Ellison, Lezama, Sr.—who was permitted to sit through the trial up to that point—was improperly allowed to testify and present information that, Ellison argues, was contradictory to Wingert's testimony. We disagree.

On the first day of trial, the parties agreed that Lezama, Sr. would be excluded from the application of Texas Rule of Evidence 614 (the Rule)[1] because he would be testifying as Christian's next of kin and did not have "any factual information as it relates to the case."

Two days later, and after Wingert's testimony concluded—Lezama, Sr. notified the State that he had watched a YouTube video of a news story that included a clip of a woman outside Christian's apartment complex on the date of the murder and in which gunfire can be heard. Lezama, Sr. counted the number of gunshots—

---

[1] *See* TEX. R. EVID. 614 ("At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony.").

nine—that he heard in this video. He then recalled that he had found a shell casing inside Christian's apartment after the crime scene investigation was complete but had thrown the casing away.

The State informed both the defense and trial court that neither it nor law enforcement was aware of this information until Lezama, Sr. reported it to them during trial. The trial court granted the defense's request for a continuance to allow it to investigate this information.

When the parties reconvened, the defense moved for a mistrial. The defense agreed that "both sides were surprised by the information that Mr. Lezama, Senior brought forward and we truly believe that the State had no knowledge of that until that moment [on] July 17th when it was first brought forward." But the defense argued that it was moving for a mistrial "because of the way it affected our defense of our client." The defense explained that Lezama, Sr. was excluded from the Rule because he was going to be the next-of-kin witness and would not testify at the guilt/innocence stage. But because "he made himself a fact witness . . . after the State's crime scene unit officer . . . already testified to the number of cartridge casings," this "potentially change[d] [the] defense." And, the defense argued, "[i]t probably changed the way we had selected [the] jury."

The State responded that there was no evidence that Lezama, Sr. had intentionally sought to destroy evidence. And, because a mistrial is an extraordinary

7

remedy, the State argued that the trial court should consider less drastic alternatives before granting a mistrial. The State contended that any prejudice had already been remedied in light of the trial court's continuance, which allowed an investigator for the defense to interview Lezama, Sr. about this new information. Additionally, the State argued that the defense had the right to recall a witness, to cross-examine Lezama, Sr. on this issue, and to argue this in closing.

The trial court denied the Ellison's motion for mistrial.

Lezama, Sr. subsequently testified that he was allowed to return to Christian's apartment after the crime scene investigation was complete. As he was sorting through Christian's things, Lezama, Sr. moved the TV stand and "a little spent casing" rolled out from underneath the TV stand. He testified that the casing appeared to be "on the bigger end of bullets" and did not appear to be a .22 caliber. Lezama, Sr. testified that he did not know what to do with the spent casing and threw it in the trash pile. He did not speak to law enforcement, or anyone else, about what he found.

Lezama, Sr. further testified that after hearing Wingert's testimony that eight spent casings were found at the scene, he reviewed a YouTube video sent to him by one of Christian's fans. This video was taken by a bystander who coincidentally happened to be outside Christian's apartment complex at the time of the murder and

8

recorded the sound of gunfire. After viewing the video, Lezama, Sr. reported this information about the spent casing to the State the next day.

## A. Standard of Review

We review a trial court's denial of a motion for mistrial under an abuse of discretion standard of review. *Becerra v. State*, 685 S.W.3d 120, 127 (Tex. Crim. App. 2024); *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). In applying this standard, we do not substitute our judgment for that of the trial court. *Becerra*, 685 S.W.3d at 127. Rather, we must decide whether the trial court's decision was arbitrary or unreasonable. *Id.* A trial court abuses its discretion when no reasonable view of the record could support its ruling. *Id.*

In making that determination, we are instructed to uphold a trial court's decision to deny a mistrial "if it was within the zone of reasonable disagreement." *Archie*, 221 S.W.3d at 699; *Griffin v. State*, 571 S.W.3d 404, 416 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd). And we must review the trial court's ruling in light of the arguments that were before the trial court at the time it ruled. *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004).

A mistrial is an extreme remedy. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). It is to be used sparingly for "a narrow class of highly prejudicial and incurable errors" committed during the trial process. *Turner v. State*, 570 S.W.3d

250, 268 (Tex. Crim. App. 2018).[2] It is reserved for improper conduct during trial that is "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (internal quotations omitted). And is "an extreme remedy and should be exceedingly uncommon." *Williams v. State*, 417 S.W.3d 162, 175 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd).

The State argues that we must balance three factors in determining whether the refusal to grant a mistrial here was an abuse of discretion: (1) the severity of the misconduct (including its prejudicial effect), (2) the effectiveness of the curative measures taken, and (3) the certainty of the conviction absent the misconduct. *See Hawkins*, 135 S.W.3d at 77 (citing *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998)).[3]

---

[2]  *See Archie v. State*, 340 S.W.3d 734, 739 (Tex. Crim. App. 2011) (explaining that motion for mistrial is appropriate only when "the objectionable events are so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant" (internal quotations omitted)).

[3]  It is not clear whether these factors apply outside the context of a refusal to grant a mistrial for improper argument, but Ellison makes no argument to the contrary. Accordingly, we assume they apply here for purposes of our analysis. *See Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (holding that *Mosley* factors should be used to evaluate whether trial court abused its discretion in denying mistrial for improper argument, but stating "[n]evertheless, the question of whether a mistrial should have been granted involves most, if not all, of the same considerations that attend a harm analysis").

**B.    Analysis**

On this record, the trial court could have reasonably concluded that the new information revealed by Lezama, Sr. was not so prejudicial that further time and expense would be futile and, thus, a mistrial was not warranted. *See Turner*, 570 S.W.3d at 268; *Hawkins*, 135 S.W.3d at 77.

We consider first Ellison's contention that a mistrial should have been granted because after Lezama, Sr. heard Wingert's testimony, he came forward with new information that contradicted Wingert's testimony.  In support, he cites to case law setting forth the standard for reviewing a trial court's decision to permit a witness to testify even after there has been a violation of the Rule.[4]

But Ellison did not separately seek to exclude Lezama, Sr.'s testimony in the trial court on the basis that there had been a violation of the Rule.  Nor did he argue that the trial court should grant a mistrial because Lezama, Sr. violated the Rule. And, as Ellison acknowledges, the parties agreed to exempt Lezama, Sr. from application of the Rule because, at the time, they did not anticipate that he had any factual information related to the case.  Accordingly, Ellison's contention that a

---

[4]     *See, e.g.*, *Bell v. State*, 938 S.W.2d 35, 50 (Tex. Crim. App. 1996) (noting that trial court has discretion to allow testimony from witness who has violated sequestration rule and that, in reviewing trial court's decision to allow testimony, courts look at whether defendant was prejudiced by witness's violation by considering whether witness actually conferred or heard testimony of other witnesses and whether witness's testimony contradicts testimony of witness from opposing side).

11

mistrial was warranted based on a purported violation of the Rule is not properly before us. *See Wead*, 129 S.W.3d at 129–30 (holding court of appeals erred in considering appellant's argument for mistrial that was not made in trial court).

Nor was there evidence of any misconduct on the part of the State. *See Hawkins*, 135 S.W.3d at 77 (considering severity of misconduct in determining whether denial of mistrial was abuse of discretion). Defense counsel expressly stated that both sides were surprised by Lezama, Sr.'s disclosure and that he believed that the State had no prior knowledge of this information. The State alerted defense counsel and the trial court as soon as it learned of this new information. And the trial court likewise concluded that both sides were surprised and that the spent casing was not available "through no one's fault."

Moreover, Ellison has not identified how he was prejudiced by Lezama, Sr.'s disclosure. Rather, Ellison argues only that a mistrial should have been granted because Lezama, Sr. "meddle[d] in the trial and evidence," and his story of "the undisclosed shell casing was nothing more than an attempt to undermine the defense." He critically fails to explain *how* Lezama, Sr.'s testimony undermined the defense.[5]

---

[5] And based on Ellison's apparent theory at trial that the scene was so chaotic it was impossible to know what happened and who shot Christian, this newly disclosed evidence of yet another spent casing seems to support rather the contradict the defense.

12

Furthermore, the trial court employed less drastic measures than a mistrial in order to cure any prejudice. *See id.* (holding that courts should consider effectiveness of curative measures taken). Ellison requested—and the trial court granted—a continuance to allow Ellison to investigate the newly disclosed information. And, after the State called Lezama, Sr. during its case-in-chief, Ellison was able to cross-examine Lezama, Sr. about his discovery and why he did not report it to law enforcement or to the State.

And during closing argument, Ellison was able to argue about the significance of this evidence—urging the jury not to give "a pass to a grieving father who found evidence and decided to destroy it and not turn it in." Ellison argued that this piece of evidence "could have been a very big deal because we don't know what caliber that casing may have been. We don't know if there was another shooter . . . [or] if Christian's people weren't shooting at [Ellison]."

Finally, there was ample evidence of Ellison's guilt. *See id.* (considering certainty of conviction). As noted above, social media messages before the murder showed that Ellison planned to rob Christian with the help of Williams and Sykes. Hernandez described the events leading up to the shooting, including Ellison leaving the apartment to go to the gas station, and then once Ellison returned, Hernandez saw Ellison grab two firearms. Although Hernandez did not see Ellison shoot Christian, he heard Ellison order Christian to hand over his jewelry or he would

13

shoot him. When Christian refused, Hernandez heard them "tussle[]" and then several shots. And surveillance footage from the apartment complex taken from around the time of the 9-1-1 call showed Ellison, Williams, and Sykes exiting the apartment building. Ellison's shirt was covered in what appeared to be blood. This evidence was sufficient to support Ellison's conviction for capital murder committed in the course of committing a robbery. *See* TEX. PENAL CODE § 19.03(a)(2); *see also id.* §§ 19.02(b)(1), 29.02.[6]

We therefore conclude, for all these reasons, that Lezama, Sr.'s disclosure during trial was not so prejudicial and incurable that it warranted the extreme step of a mistrial. Accordingly, we hold that the trial court did not abuse its discretion in denying Ellison's motion for a mistrial.

## Conclusion

We affirm the trial court's judgment of conviction in all things.

Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Caughey and Johnson.

Do not publish. TEX. R. APP. P. 47.2(b).

---

[6]     Ellison was charged as a principal actor, party, and conspirator.

14