**Opinion issued May 30, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-22-00390-CR**

**NO. 01-22-00391-CR**

———————————

**CHARLES EUGENE MARTINEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 174th District Court**
**Harris County, Texas**
**Trial Court Case Nos. 1464975, 1464976**

## MEMORANDUM OPINION

A jury convicted appellant, Charles Eugene Martinez, of two counts of the second-degree felony offense of sexual assault of a child and assessed his

punishment at fifteen years' confinement for each count.[1] The trial court ordered the sentences to run consecutively.

In five issues, Martinez argues that (1) the trial court erred by admitting extraneous offense testimony from child victims other than the complainant; (2) the trial court erred by excluding the testimony of a witness concerning the complainant's truthfulness; (3) the trial court erred by failing to grant Martinez's motion for mistrial following an improper closing argument by the prosecutor; (4) the trial court erred by denying four of Martinez's challenges for cause; and (5) Martinez was denied his right to a speedy trial. We affirm.

## Background

In 2008, M.M. ("Matthew") and his then-wife decided to adopt two sisters from Estonia, the complainant M.S.M. ("Megan") and K.M. ("Katherine").[2] Megan was eleven years old at the time, and Katherine was thirteen. Shortly after Matthew adopted Megan and Katherine, he and his wife divorced, and he was granted conservatorship over the girls.

---

[1]  *See* TEX. PENAL CODE § 22.011(a)(2)(C). Trial court cause number 1464976 resulted in appellate cause number 01-22-00390-CR. Trial court cause number 1464975 resulted in appellate cause number 01-22-00391-CR.

[2]  In this opinion, we refer to the complainant, her family members, and two extraneous offense witnesses by pseudonyms to protect their privacy.

Matthew and the girls moved into a house in the Willowbrook area of Houston in 2009. Their neighbors were Charles Martinez and his wife, Michelle. Matthew found Martinez to be outgoing and welcoming, and they quickly developed a friendship. Matthew began attending Bible study at Martinez's house, and he also became involved with a local baseball team that Martinez played for and went on fishing trips with Martinez. Martinez represented that he was an evangelist, and he traveled frequently as part of his ministry. Martinez's faith and friendly demeanor caused Matthew to place trust in him.

At first, to Matthew's knowledge, Martinez had a "normal relationship" with Megan. Megan would often take care of Martinez's dogs when he traveled. Martinez also frequently invited Matthew and his daughters over for dinner, and Megan would sometimes go over early and help Michelle prepare the meal. Martinez also owned horses that were stabled at a ranch in Waller County, and Martinez's family and Matthew's family would ride horses together.

When Megan was around fourteen years old in 2011, Matthew started feeling suspicious about the relationship between Martinez and Megan. One day, Matthew returned home from work and could not find Megan. He repeatedly called both Megan and Martinez, and neither one of them answered. Finally, Martinez answered his phone and told Matthew that he was with Megan, and they had been riding horses together. When Matthew expressed confusion over why Megan was with Martinez

riding horses, Martinez responded that Megan had told him that she had permission and he did not know that Matthew was unaware of this. No other adult—such as Michelle—was present. Although Megan and Martinez reassured Matthew that nothing inappropriate had happened, Matthew spoke with Martinez and Michelle about his concerns and decided that his family's relationship with the Martinez family needed to slow down.

Over the next several years, relations between the families slowly and gradually warmed up. Megan would still take care of Martinez's dogs when he traveled, and she would sometimes help Michelle with things around the house, but Matthew tried to avoid having Megan be alone with Martinez. After the 2011 incident, Matthew did not give permission for Megan to go to the ranch alone with Martinez.

Megan turned seventeen in the summer of 2014. The following March, Matthew's current wife L.M. ("Laura") reviewed their family cell phone bill and discovered that Megan and Martinez had been calling and texting each other over a hundred times a month at all times of the day, including late at night. The quantity of text messages led Matthew to believe that Martinez and Megan were communicating about more than whether Megan could take care of Martinez's dogs, and Matthew decided to speak to Megan about the situation. Matthew and Laura were unable to see any text messages from Martinez on Megan's phone because

4

Megan said that she had deleted them. Matthew asked Megan whether Martinez had done anything to her, and although she did not answer at first, she finally said, "Yes, he did it." Matthew took Megan to the police, and an investigation into Martinez began. Authorities filed a complaint against Martinez on April 16, 2015, and he was indicted for two counts of sexual assault of a child on October 13, 2015.

The cases against Martinez were reset multiple times over the next several years for various reasons, including pretrial discovery matters, Hurricane Harvey, and the COVID-19 pandemic. On October 28, 2021, shortly before a trial setting in November 2021, and more than six years after Martinez was indicted, Martinez moved to dismiss the indictments on speedy trial grounds. After a short non-evidentiary hearing on November 11, 2021, the trial court denied the motion, stating, "I know I've called this case to trial several times and y'all weren't ready." Four days later, on November 15, 2021, voir dire began, but the parties were unable to pick a jury and trial was reset for May 2022.

At trial, Megan testified that her first impression of Martinez was that he was a nice, welcoming man. She got to know him, Michelle, and their adult daughter Kristen, who lived out of state when Megan first met the Martinez family.[3] Megan

---

[3] Although Megan was not sure of the dates, she did remember that Kristen and her son lived with Martinez and Michelle at some point. She also testified that she discussed the possibility of babysitting for Kristen with Matthew. Megan did not remember talking to Kristen about the possibility of living with her.

considered her relationship with Michelle to be a friendly one, but she did not view Michelle as a maternal figure. Megan did not receive texts or calls from Michelle using Martinez's phone.

Megan testified that when she was in eighth grade, she arrived home from school one day and Martinez was outside and asked her if she wanted to ride horses at the ranch in Waller County. Megan did not inform Matthew about this trip, but she also did not believe that Matthew would have a problem with her going because they trusted Martinez and their families were good friends. After spending an hour or two riding horses, Martinez took Megan to a trailer on the property, laid her down on a bed, undressed her, and had vaginal intercourse with her. Shortly after this, Matthew called both Megan and Martinez. Martinez told Matthew that Megan had received permission to go to the ranch that day, which was not true. After the phone call, Martinez spoke with Megan and told her not to tell anyone—specifically, her parents—what had happened, and they also discussed what they would tell Matthew when they arrived back at Megan's house.

After this incident, Megan continued to have contact with Martinez, primarily at his house. Martinez was "really nice" to her, "made [her] feel great," and brought her gifts from his travels. When Megan had disagreements with Matthew, she would go to Martinez, who would "be there for [her]" and would "be on [her] side." Megan agreed that she frequently got in trouble at home, and she would occasionally sneak

6

out of the house at night. At one point she wanted to move into Martinez's house, and she had discussions with Martinez and Michelle about this, but they told her that she could not leave her parents' house before she was eighteen.

Megan estimated that she and Martinez had intercourse on four occasions over the next several years, and he would sometimes touch her inappropriately after Bible study meetings. The incidents of intercourse occurred at Martinez's house. Michelle was present at the house for at least one incident, although Megan did not see her. Megan testified that the last occasion occurred in early 2015, after she had turned seventeen. Megan also testified that she and Martinez texted each other up until the time her parents found out in March 2015. Some of these texts concerned innocent topics such as Martinez's dogs, but other texts were flirtatious and included declarations of love. Megan deleted all the texts at Martinez's insistence.

During the guilt-innocence phase of trial, the State called two witnesses—A.S. ("Alice") and C.H. ("Crystal")—to testify concerning extraneous sexual assault of a child offenses allegedly committed against them by Martinez. *See* TEX. CODE CRIM. PROC. art. 38.37, §§ 2(b), 2-a (permitting, in trials for certain sexual offenses and under certain circumstances, evidence that defendant committed separate sexual offense "for any bearing the evidence has on relevant matters," including defendant's character). Alice testified that she met Martinez and Michelle at a Christian ranch for adolescents in Brazoria County around her thirteenth or

7

fourteenth birthday in January 2000 or 2001. The first night she was present at the ranch, she woke up to Martinez touching her breasts underneath her shirt. Martinez touched her vagina over her underwear, but something in the house startled him and he left the bedroom. The following day, after Michelle left the house, Martinez touched Alice inappropriately a second time and only stopped because Michelle returned home. Alice's parents picked her up from the ranch later that day, and she immediately told them what had happened.

Crystal was around seven or eight years old in the early 1990s when Martinez started dating her mother. Crystal and her mother would sometimes stay with Martinez at his ranch in Brazoria County. On one occasion, when Crystal was around eight years old and her mother was out of town, Martinez put his fingers inside her vagina and then had vaginal intercourse with her. She testified that on three other occasions, Martinez placed his fingers in her vagina while her mother was in the shower. Crystal told her mother about what had happened several years later.

Martinez called several witnesses to testify on his behalf, including his daughter Kristen, his mother, and other acquaintances. These witnesses testified concerning the layout of and the furniture in Martinez's current house and the house in Brazoria County, Kristen's relationship with Megan, Michelle's relationship with Megan, what was located at the Waller County ranch, storage of a trailer owned by

Martinez, how sound carries in both Martinez's current house and the Brazoria County house, and the frequency of Martinez's travels.

Michelle also testified on Martinez's behalf. She testified that Martinez traveled seven or eight times a year for his ministry, both within the United States and internationally, and that he also traveled for his baseball team. Michelle presented bank records, credit card records, travel documents, and pictures to corroborate Martinez's out-of-town trips. Michelle also testified that Martinez did not own the ranch where his horses were stabled, and he never stored a trailer at that property. She further testified that in early 2015, Megan approached her and Martinez about problems she was having with Matthew and asked if she could move into their house, but Michelle and Martinez responded that she could not because she was underage.

Michelle testified that she would sometimes text with Megan while using Martinez's phone, and sometimes this would occur late at night. When Martinez texted Megan, he would encourage her to stay out of trouble and would share scripture passages with her. This behavior concerned Michelle, and she discussed this with Martinez, but she did not remember what his response was to her concerns. She agreed that although she worked, Martinez and his ministry was the primary source of income for the family.

The jury found Martinez guilty of two counts of sexual assault of a child and assessed his punishment at fifteen years' confinement for each count.[4] The trial court ordered the sentences to run consecutively. This appeal followed.

**Admission of Extraneous Offense Evidence**

In his first issue, Martinez contends that the trial court erred by admitting extraneous offense testimony from Alice and Crystal. He acknowledges that the current version of Code of Criminal Procedure article 38.37 permits this category of testimony, but he argues that the version in effect at the time of the alleged extraneous offenses did not, and therefore the trial court should not have admitted this testimony.

Code of Criminal Procedure article 38.37 governs the admissibility of extraneous offenses or acts in trials of defendants for certain offenses, including sexual assault of a child. *See* TEX. CODE CRIM. PROC. art. 38.37, § 2(a)(1)(D). When this provision was originally enacted in 1995, it provided that "[n]otwithstanding Rules 404 and 405, Texas Rules of Criminal Evidence, evidence of other crimes, wrongs, or acts committed by the defendant *against the child who is the victim of the alleged offense* shall be admitted for its bearing on relevant matters," including (1) the state of mind of the defendant and the child and (2) the previous and

---

[4]   A grand jury had also charged Martinez with sexual assault of a disabled person against Katherine. That offense was not tried in the underlying proceeding.

10

subsequent relationship between the defendant and the child. Act of May 29, 1995, 74th Leg., R.S., ch. 318, § 48(a), 1995 Tex. Gen. Laws 2734, 2748–49 (codified at TEX. CODE CRIM. PROC. art. 38.37, § 1) (emphasis added). The bill enacting this article provided that the new statute "applies to any criminal proceeding that commences on or after the effective date of this Act, regardless of whether the offense that is the subject of the proceeding was committed before, on, or after the effective date of this Act." Act of May 29, 1995, 74th Leg., R.S., ch. 318, § 48(b), 1995 Tex. Gen. Laws 2734, 2749.

Article 38.37 has been amended several times. Two of these amendments are relevant to Martinez's arguments in this appeal. In 2013, the Legislature added a second section to article 38.37. In addition to allowing the admission of other extraneous offenses against the child who is the victim of the charged offense, newly added section 2 provided that in a trial for certain offenses including sexual assault of a child:

> Notwithstanding Rules 404 and 405, Texas Rules of Evidence, and subject to Section 2-a,[5] evidence that the defendant has committed a separate offense described by Subsection (a)(1) or (2) [listing eight different offenses under the Penal Code plus an attempt or conspiracy to commit one of the listed offenses] may be admitted in the trial of an

---

[5] Article 38.37, section 2-a, requires the trial court to hold a hearing outside the presence of the jury to determine whether the evidence likely to be admitted at trial "will be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt." Act of May 17, 2013, 83d Leg., R.S., ch. 387, § 1, 2013 Tex. Gen. Laws 1167, 1168 (codified at TEX. CODE CRIM. PROC. art. 38.37, § 2-a).

alleged offense described by Subsection (a)(1) or (2) for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant.

Act of May 17, 2013, 83d Leg., R.S., ch. 387, § 1, 2013 Tex. Gen. Laws 1167, 1167–68 (codified at TEX. CODE CRIM. PROC. art. 38.37, § 2); *Belcher v. State*, 474 S.W.3d 840, 844 (Tex. App.—Tyler 2015, no pet.) (stating that 2013 amendments to article 38.37 allow admission of "evidence that the defendant has committed certain offenses against a *nonvictim* of the charged offense"). The Legislature specified that this change in law "applies to the admissibility of evidence in a criminal proceeding that commences on or after the effective date of this Act," September 1, 2013. Act of May 17, 2013, 83d Leg., R.S., ch. 387, § 2–3, 2013 Tex. Gen. Laws 1167, 1168.

In 2021, the Legislature amended Penal Code section 21.02, the continuous sexual abuse of a young child statute, to expand the applicability of that offense to include an offense committed against "a disabled individual." Act of May 19, 2021, 87th Leg., R.S., ch. 221, §§ 1.01–.02, 2021 Tex. Gen. Laws 478, 478–79 (codified at TEX. PENAL CODE § 21.02). The enacting legislation included "conforming amendments" to numerous statutes throughout the Texas Codes to reflect the change in language of Penal Code section 21.02 from "continuous sexual abuse of young child" to "continuous sexual abuse of young child or disabled individual."

One of the statutes so amended was article 38.37, section 2(a), which had stated that it applied to the trial of a defendant for certain offenses, including

12

"Continuous Sexual Abuse of Young Child." Under the 2021 amendments, article 38.37, section 2(a), was changed to read that one of the applicable offenses was Penal Code "Section 21.02 (Continuous Sexual Abuse of Young Child or Disabled Individual)." Act of May 19, 2021, 87th Leg., R.S., ch. 221, § 2.12, 2021 Tex. Gen. Laws 478, 486. The Legislature made no other changes to article 38.37. In enacting the 2021 amendments, the Legislature provided that "[t]he change in law made by this Act applies only to an offense committed on or after the effective date of this Act," September 1, 2021, while an offense "committed before the effective date of this Act is governed by the law in effect on the date the offense was committed, and the former law is continued in effect for that purpose." Act of May 19, 2021, 87th Leg., R.S., ch. 221, §§ 3.01–.02, 2021 Tex. Gen. Laws 478, 498.

On appeal, Martinez argues that although his trial occurred in May 2022, "the offenses for which [he] was on trial did occur long before September 1, 2021," and therefore the version of article 38.37 "in effect at the time the alleged offenses were committed controls." He argues that the 2021 amendment "refers all offenses committed before its effective date to the law in place at the time the offense was committed," and the version of article 38.37 "in effect at the time the offenses in this case are alleged to have occurred did not allow for the jury to hear evidence of sexual abuse perpetrated on non-complaining witnesses." We disagree.

13

The indictments alleged that Martinez committed two offenses of sexual assault of a child on or about July 6, 2012, and July 6, 2013. At that time, the 2013 amendment to article 38.37 allowing admission of extraneous offenses committed against children other than the complainant had not yet gone into effect. However, in enacting the 2013 amendment, the Legislature provided "[t]he change in law made by this Act applies to the admissibility of evidence *in a criminal proceeding that commences on or after the effective date of this Act*." Act of May 17, 2013, 83d Leg., R.S., ch. 387, § 2, 2013 Tex. Gen. Laws 1167, 1168 (emphasis added). The 2013 amendment became effective on September 1, 2013. The grand jury indicted Martinez for the underlying charged offenses on October 13, 2015. Because this criminal proceeding commenced after the 2013 amendment became effective on September 1, 2013, the 2013 amendment applies to this proceeding.

The 2021 amendment to article 38.37 does not change this conclusion. The primary focus of this amendment was to expand Penal Code section 21.02—criminalizing continuous sexual abuse—to apply to disabled individuals in addition to children younger than fourteen. Act of May 19, 2021, 87th Leg., R.S., ch. 221, §§ 1.01–.02, 2021 Tex. Gen. Laws 478, 478–79. The Legislature then amended multiple statutes in multiple codes that cross-referenced section 21.02, including article 38.37, to reflect the change to section 21.02. *See* Act of May 19, 2021, 87th Leg., R.S., ch. 221, §§ 2.01–.28, 2021 Tex. Gen. Laws 478, 480–98. The Legislature

14

stated: "The *change in law made by this Act* applies only to an offense committed on or after the effective date of this Act. An offense committed before the effective date of this Act is governed by the law in effect on the date the offense was committed, and the former law is continued in effect for that purpose." Act of May 19, 2021, 87th Leg., R.S., ch. 221, § 3.01, 2021 Tex. Gen. Laws 478, 498 (emphasis added).

By beginning the paragraph with "[t]he change in law made by this Act," the Legislature specified that the change made by the 2021 amendment—the expansion of the reach of Penal Code section 21.02 to cover continuous sexual abuse of disabled individuals—only applies to offenses committed after the amendment became effective on September 1, 2021, but does not apply to offenses committed before that date. In this case, the offenses were committed years before September 1, 2021, but this case does not involve continuous sexual abuse of a young child or a disabled individual. The 2021 amendment to article 38.37 simply has no effect on the underlying offenses or the trial of these offenses. The 2021 legislation cannot reasonably be read as providing that the *2013 amendment*, which had been in effect for eight years by that point and had been applicable to criminal proceedings that commenced after September 1, *2013*, suddenly would no longer have any effect if the offense was committed prior to September 1, 2013.

15

We hold that because this criminal proceeding commenced after September 1, 2013, the trial court did not err by concluding that the 2013 amendment allowing admission of extraneous offense evidence by non-complaining child witnesses under certain circumstances applies to this case.

We overrule Martinez's first issue.[6]

**Exclusion of Witness Testimony**

In his second issue, Martinez argues that the trial court erred by excluding the testimony of Susan Sweeney, a Fort Bend County Assistant District Attorney, who believed that Megan had lied under oath while acting as a witness during an unrelated criminal proceeding. Martinez contends that Sweeney should have been

---

[6] Martinez argues on appeal that the 2013 amendment is an impermissible ex post facto law because the relevant extraneous offenses allegedly occurred around 1992 and 2000, well before the Legislature enacted article 38.37 and then amended it to apply to the testimony of non-complaining child witnesses. Other Texas intermediate appellate courts have rejected such challenges to article 38.37, section 2. *See, e.g.*, *Baez v. State*, 486 S.W.3d 592, 600 (Tex. App.—San Antonio 2015, pet. ref'd) (concluding that article 38.37, section 2(b), was not impermissible ex post facto law because it "does not allow extraneous offense evidence to be offered as substantive evidence of guilt"; State "must still satisfy its burden of proof as to each element of the offense"; and statute does not "alter[] the legal rules of evidence to allow less or different testimony than the law required at the time of the commission of the [offense] in order to convict the defendant"); *Robisheaux v. State*, 483 S.W.3d 205, 214–15 (Tex. App.—Austin 2016, pet. ref'd) (adopting reasoning from *Baez*); *Ryder v. State*, 514 S.W.3d 391, 401–02 (Tex. App.—Amarillo 2017, pet. ref'd) (agreeing with *Baez*); *see also Alvarez v. State*, 491 S.W.3d 362, 368 n.3 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (noting that article 38.37 is evidentiary rule that enlarges scope of child's admissible testimony but "leaves untouched the amount or degree of proof required for conviction" and therefore applying article 38.37 "does not implicate ex post facto concerns") (quotations omitted).

allowed to testify concerning Megan's character for truthfulness under Rule of Evidence 608.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018). The trial court abuses its discretion if it acts without reference to any guiding rules or principles or if it acts arbitrarily or unreasonably. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). We will uphold the court's decision if it was within "the zone of reasonable disagreement." *Beham*, 559 S.W.3d at 478 (quotations omitted).

A party may attack or support the credibility of a witness by "testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character." TEX. R. EVID. 608(a). With an exception not relevant here, "a party may not inquire into or offer extrinsic evidence to prove specific instances of the witness's conduct in order to attack or support the witness's character for truthfulness." TEX. R. EVID. 608(b).

When a witness testifies concerning another witness's reputation, that testimony "must be based on discussion with others about the subject, or on hearing others discuss the person's reputation, and not just on personal knowledge." *Smallwood v. State*, 471 S.W.3d 601, 609 (Tex. App.—Fort Worth 2015, pet. ref'd) (op. on reh'g) (quotations omitted); *see Adanandus v. State*, 866 S.W.2d 210, 226

17

(Tex. Crim. App. 1993). The testimony cannot be based upon specific acts of conduct of the witness "but rather upon a synthesis of 'observations and discussions which results in a conclusion as to the individual's reputation.'" *Garza v. State*, 18 S.W.3d 813, 824 (Tex. App.—Fort Worth 2000, pet. ref'd) (quoting *Adanandus*, 866 S.W.2d at 226). "To be an appropriate reputation witness, the witness must have a substantial familiarity with the reputation of the person about whom the witness is supposed to testify." *Id.*; *see Smallwood*, 471 S.W.3d at 609 (quotations omitted).

During a hearing outside the presence of the jury, Martinez argued that he should be allowed to call Susan Sweeney, an assistant district attorney in Fort Bend County, to testify concerning her opinion of Megan's truthfulness. Sweeney testified that she had been involved in prosecuting a case against Ahmed Altae, Megan's husband, in 2018. During her investigation, she discussed Altae and his family, including Megan, with multiple police officers, prosecutors, and other witnesses. Sweeney also listened to numerous jail calls, including calls between Altae and Megan, calls between Altae and other people, and calls between Altae's co-defendants and people potentially involved with those co-defendants. Sweeney called Megan to testify in one of Altae's bond hearings. Based upon Sweeney's investigation, she believed that Megan lied while under oath. Sweeney refused to testify concerning Megan's motivation, but she agreed that Megan's testimony helped Altae.

Sweeney also testified that she became aware that Megan had failed to appear in court at one point and had cut off her ankle monitor. She did not agree that she considered these facts when she formed her belief that Megan had lied under oath. Sweeney stated: "I see them as separate from the statements under oath. I don't know what conclusions one would draw from that conduct or if they can be ascribed to [Megan]." When asked if it was her "belief that [Megan] lies under oath," Sweeney responded, "It's my belief that she lied under oath in that hearing with regard to, I believe, two topics." When defense counsel asked whether she believed that Megan "lies under oath when it benefits someone that she cares about," Sweeney responded that use of the word "lies" in counsel's question "suggests that it's a prediction, a habit, a frequent circumstance." Sweeney stated that her opinion "is that [Megan] lied on that particular occasion regarding what I recall being two topics."

Sweeney further testified that, at one point, Megan lied to police officers. She agreed that "there are at least two occasions where [she knew] that [Megan] lied." Sweeney agreed that the lie to police officers also benefitted Altae, but she did not know Megan's motivation for lying on that occasion. Sweeney testified: "She lied on two occasions that I'm aware of."

The State had the following exchange with Sweeney:

Q.    [D]o you have an opinion on [Megan's] reputation for having a
      character for truthfulness or untruthfulness in the community in
      general?

A.    I do not.

Q.    And, Ms. Sweeney, do you have an opinion on your own about [Megan's] propensity for truthfulness in general?

A.    I do not.

On re-direct examination, Sweeney did not agree that she had an opinion that Megan "has a propensity to lie," stating again that she "know[s] about those two occasions" and she "believe[d] that [Megan] lied on those two occasions."

The trial court stated:

So based on what I'm hearing in the testimony of the witness is that Ms. Sweeney does not believe the two occasions in which she believes the complainant in our case was not being truthful is sufficient for her to draw an opinion. That's what she just testified to, that she doesn't think that's sufficient information for her to testify as a character witness on her opinion of the truthfulness of [Megan].

So if you're asking to then still call [Sweeney] as a witness for the purpose of impeaching [Megan] to show that, in fact, [Sweeney] really has some type of opinion that [Megan's] not truthful, it's clearly not allowed by the rules to get into specific instances of conduct—opening the door to get into specific instances of conduct. That would be the only way you could try to impeach [Megan] to say, you know, the jury can really believe [Sweeney] thinks [Megan's] not truthful in general.

The fact that the witness—that [Megan] has lied under oath based on [Sweeney's] opinion I don't think is sufficient to establish, in and of itself, character. Again, it has to come from a witness that has a basis for their opinion, a reliable basis, and [Sweeney] said she does not have a reliable basis for that opinion.

The trial court did not allow Martinez to call Sweeney as a witness.

On appeal, Martinez argues that Sweeney's testimony should have been admitted because neither the Rules of Evidence nor caselaw require "that the witness

have an opinion that prevails in a certain size community." Caselaw also does not specify "which community nor does it narrow the confines of [Rule] 608 to *only* general community reputation opinion." Martinez argues that Sweeney discussed Megan's reputation for truthfulness with multiple people, and her testimony met the requirements of Rule 608.

Sweeney acknowledged that during the prosecution of the case against Altae, she spoke with other people—including prosecutors, police officers, and witnesses—about Megan, although she did so "[m]ore with regard to the facts of the case." She did not testify that she spoke to other people about Megan's reputation for truthfulness. Importantly, although Sweeney testified that she believed that Megan lied under oath on "two topics" during a bond hearing in Altae's case, she also unequivocally stated that she did not have an opinion on Megan's "reputation for having a character for truthfulness or untruthfulness in the community in general." She also testified that she did not have an opinion "on [her] own" about Megan's "propensity for truthfulness in general."

We agree with the State that Martinez did not establish that Sweeney's testimony was admissible under Rule 608. Sweeney specifically testified that she did not have an opinion about Megan's reputation for truthfulness or untruthfulness, and she did not have an opinion of her own about Megan's propensity for truthfulness. *See* TEX. R. EVID. 608(a) ("A witness's credibility may be attacked or

supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character."). Instead, Sweeney believed, based on her investigation during Altae's prosecution, that Megan did not tell the truth on two instances while under oath at a bond hearing in Altae's case. However, under Rule 608, "a party may not inquire into or offer extrinsic evidence to prove specific instances of the witness's conduct in order to attack or support the witness's character for truthfulness." TEX. R. EVID. 608(b); *Garza*, 18 S.W.3d at 824 (stating that permissible testimony under Rule 608 cannot be based upon "specific acts of conduct of the witness whose credibility is being attacked").

We hold that the trial court did not abuse its discretion by excluding Sweeney's testimony concerning Megan's truthfulness. *See* TEX. R. EVID. 608.

We overrule Martinez's second issue.

**Improper Closing Argument**

In his third issue, Martinez argues that the trial court erroneously denied his motion for mistrial made after the prosecutor suggested during closing argument that Martinez had also abused his wife.

Proper jury argument generally falls within four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement. *Brown v. State*, 270 S.W.3d

564, 570 (Tex. Crim. App. 2008). "It is the duty of trial counsel to confine their arguments to the record; reference to facts that are neither in evidence nor inferable from the evidence is therefore improper." *Id.* (quoting *Alejandro v. State*, 493 S.W.2d 230, 231 (Tex. Crim. App. 1973)); *see Freeman v. State*, 340 S.W.3d 717, 728 (Tex. Crim. App. 2011) ("Improper references to facts that are neither in evidence nor inferable from the evidence are generally designed to arouse the passion and prejudice of the jury and, as such, are inappropriate."). "[E]rror exists when facts not supported by the record are interjected in the argument," but this error is not reversible "unless, in light of the record, the argument is extreme or manifestly improper." *Brown*, 270 S.W.3d at 570.

When, as here, the trial court instructs the jury to disregard improper jury argument, the proper analysis on appeal is whether the trial court erred by denying the defendant's motion for mistrial. *Williams v. State*, 417 S.W.3d 162, 175 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd); *see Hawkins v. State*, 135 S.W.3d 72, 76–77 (Tex. Crim. App. 2004). We review a trial court's ruling on a motion for mistrial for an abuse of discretion. *Young v. State*, 591 S.W.3d 579, 595 (Tex. App.—Austin 2019, pet. ref'd) (quotations omitted). We must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007); *Williams*, 417 S.W.3d at 175.

A mistrial is the trial court's remedy for improper conduct that is "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Hawkins*, 135 S.W.3d at 77 (quotations omitted). "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Id.*; *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009) ("A mistrial is an appropriate remedy in extreme circumstances for a narrow class of highly prejudicial and incurable errors.") (quotations omitted); *Williams*, 417 S.W.3d at 175 ("A mistrial is an extreme remedy and should be exceedingly uncommon."). "A mistrial is required only when the impropriety is clearly calculated to emotionally inflame the jurors' minds and is of such a character as to suggest the impossibility of withdrawing the impression produced on the jurors' minds . . . ." *Williams*, 417 S.W.3d at 175.

In most instances, an instruction to disregard will cure the error. *Id.*; *see Freeman*, 340 S.W.3d at 727–28 ("An instruction to disregard will generally cure error if a prosecutor mentions facts outside the record."). We generally presume that the jury followed the trial court's instructions. *Griffin v. State*, 571 S.W.3d 404, 417 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd).

When determining whether the trial court abused its discretion in denying a motion for mistrial due to improper jury argument, we consider and balance three factors: (1) the severity of the misconduct (the magnitude of the prejudicial effect of

the prosecutor's remarks); (2) the measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the trial court); and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction).[7] *Archie v. State*, 340 S.W.3d 734, 739 (Tex. Crim. App. 2011); *Williams*, 417 S.W.3d at 176.

During closing argument, the prosecutor stated:

We heard from his own wife, Michelle, that she had concerns about her husband texting [Megan]. And let's talk about Michelle for a minute. I actually kind of feel bad for her. I think she's stuck in a horrible situation and there's not much she can do about it. I mean, she had concerns her husband was texting this teenager and there was nothing she could do about it. She's not allowed to do anything in that home.

And so when they talk about whether she [Michelle] could hear them [Martinez and Megan] having sex downstairs or not, unfortunately, it's possible she heard them and there's nothing she could do about it because he's her only source of income from these mysterious donors. And he's abusive. If he's abusing an 8-year-old and a 15-year-old, there's nothing to say that he's also not abusing her.

---

[7] Martinez argues that because the prosecutor's statements "were so far outside the record, they should be characterized as 'unsworn testimony of the prosecutor.'" He further argues that the statements affected his "substantial constitutional rights," and as a result, we should apply the harm standard for constitutional errors and reverse unless we determine that the error was harmless beyond a reasonable doubt. *See* TEX. R. APP. P. 44.2(a). The Court of Criminal Appeals, however, has noted that "most comments that fall outside the areas of permissible argument will be considered to be error of the nonconstitutional variety." *Brown v. State*, 270 S.W.3d 564, 572 n.2 (Tex. Crim. App. 2008). The court further stated that "[c]omments upon matters outside the record, while outside the permissible areas of jury argument, do not appear to raise any unique concerns that would require us to assign constitutional status." *Id.* Martinez has not cited to any authority holding that arguments such as the one made by the prosecutor in this case implicate a defendant's constitutional rights, and we therefore decline Martinez's invitation to apply the constitutional standard of harm found in Rule 44.2(a).

Defense counsel objected to this argument and asked the trial court to instruct the jury to disregard the prosecutor's last comment. The court sustained the objection and stated, "Disregard the prosecutor's last comment." The court denied defense counsel's request for a mistrial. When the prosecutor resumed argument, he discussed the text messages between Megan and Martinez, and he did not further mention any suggestion that Martinez had also abused Michelle.

On appeal, the State first acknowledges that "[a]rguably, the prosecutor's argument was improper," but it later "assumes, but does not concede, that the trial prosecutor's argument was improper." The State then argues that the trial prosecutor did not accuse Martinez of abusing Michelle, but "instead, he merely floated the possibility as an explanation for why Michelle would have testified as she did." We note that there is no testimony or documentary evidence in the record that Martinez abused Michelle in any manner. We therefore assume, without deciding, that the prosecutor's statement during closing argument did not constitute either summation of the evidence or a reasonable deduction from the evidence and was therefore improper. *See Brown*, 270 S.W.3d at 570 (listing summation of evidence and reasonable deduction from evidence as two of four general areas of permissible jury argument); *see also Griffin*, 571 S.W.3d at 417–18 (stating that when trial court sustains objection to argument and instructs jury to disregard, propriety of argument "is not the focus of our inquiry" on appeal, and we instead assume argument was

26

improper and determine whether trial court abused its discretion by denying motion for mistrial). We thus address whether the prejudice from this statement was incurable such that a mistrial was required.

### 1.    Severity of the misconduct

In examining the severity of the improper argument, we review whether it appears that the argument was a "willful and calculated effort on the part of the State to deprive [the defendant] of a fair and impartial trial. *See Williams*, 417 S.W.3d at 176 (quoting *Brown*, 270 S.W.3d at 573). Martinez argues that the prosecutor's comments were "false, misleading, inflammatory, and shocking," and the prosecutor attacked both Martinez and Michelle, "the witness most vital to the defense."

Prosecutors are allowed to argue that defense witnesses "are not worthy of belief." *Graves v. State*, 176 S.W.3d 422, 431 (Tex. App.—Houston [1st Dist.] 2004, pet. stricken) (quoting *Satterwhite v. State*, 858 S.W.2d 412, 425 (Tex. Crim. App. 1993)); *George v. State*, 117 S.W.3d 285, 288 (Tex. App.—Texarkana 2003, pet. ref'd) ("A comment on the credibility of a witness is permissible."). "Jury argument that vouches for or questions the credibility of a witness is proper if it involves a reasonable deduction from the evidence." *Graves*, 176 S.W.3d at 431 (citing *George*, 117 S.W.3d at 288). For example, proper argument can include suggesting that a defense witness has a financial incentive to lie on the defendant's behalf if such a motive can be reasonably deduced from the evidence. *Id.* at 431–32.

27

The prosecutor therefore could have permissibly called the credibility of Michelle—Martinez's wife—into question. But the prosecutor went too far in speculating that if Martinez is "abusing an 8-year-old and a 15-year-old, there's nothing to say that he's also not abusing [Michelle]." As noted above, there was no evidence in the record that Martinez was abusive to Michelle. We therefore turn to the remaining two factors to determine whether this statement was so egregious that it was impossible to withdraw any prejudicial effect.

### 2. Measures adopted to cure the misconduct

Here, after the trial court sustained defense counsel's objection to the State's argument, counsel requested that the court instruct the jury to disregard the prosecutor's last comment. The trial court stated, "Disregard the prosecutor's last comment."

"In most instances, an instruction to disregard the remarks will cure the error." *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000); *Garcia v. State*, 943 S.W.2d 215, 217 (Tex. App.—Fort Worth 1997, no pet.) ("Almost any improper argument may be cured by an instruction to disregard."). "[O]nly in the most egregious cases" involving an "extremely inflammatory statement" will a court conclude that an instruction to disregard the improper argument was an insufficient response by the trial court. *Williams*, 417 S.W.3d at 176. We presume that the jury obeys instructions given by the trial court. *Griffin*, 571 S.W.3d at 421.

Although the prosecutor's comment was inappropriate and exceeded the bounds of permissible jury argument, we do not agree with Martinez that the comment was so egregious and inflammatory that any prejudicial effect could not be cured by an instruction to disregard. Furthermore, when considering the closing arguments as a whole, we conclude that the trial court did more than give an "off-handed" instruction to disregard. On four other instances throughout argument, including during argument given by both the State and the defense, the trial court reminded the jury that the attorneys' statements were argument, not evidence.

Specifically, in response to other objections based on improper jury argument, the trial court instructed the jurors that "you are the exclusive judges of the facts proved. This is argument, it is not evidence. So you decide those things." During defense counsel's argument, the trial court stated, "Again, you'll get the written instructions in the jury charge. What the attorneys are not [sic] telling you  is not evidence. It's just an argument to persuade you one way or the other. You'll have the official jury instructions." Almost immediately after this instruction, in response to another objection, the court stated: "Again, this is not evidence. It's just an argument. All right? So you heard the evidence. You determine the facts proven. Not the attorneys." Finally, shortly before the argument at issue in this appeal, the trial court stated: "Once again, this is not evidence. It's an argument. You'll be the

29

judges of what facts were proven during the trial. All right? What they're saying is not evidence."

In addition to the trial court's instructions to the jury during other parts of the argument, the trial court also instructed the jurors in the written charge that during their deliberations, "you must not consider, discuss, nor relate any matters not in evidence before you." This Court has previously considered similar additional instructions—both oral and contained in the written charge—in assessing the efficacy of the trial court's curative measures in response to improper jury argument. *See Griffin*, 571 S.W.3d at 421; *Williams*, 417 S.W.3d at 179. In fact, we may "presume from the cumulative weight" of the trial court's instructions "that the jury understood that the State's improper comments were not evidence, and that its decision should be based only on the evidence." *Williams*, 417 S.W.3d at 179.

Additionally, in analyzing this factor, we may also consider whether the prosecutor revisited the improper argument following defense counsel's objection. *Id.* at 179–80. Here, after the trial court instructed the jury to disregard the prosecutor's comment, the prosecutor talked further about the text messages between Megan and Martinez and discussed Megan's detailed testimony, Megan's medical records, and the extraneous offense allegations. The prosecutor did not, however, again suggest that Martinez had abused Michelle as well.

When considering the entire jury argument and all the instructions given to the jury by the trial court, we conclude that the State's objected-to comment was not so egregious or inflammatory that it rendered the trial court's instruction to disregard ineffective. *See Griffin*, 571 S.W.3d at 421; *Williams*, 417 S.W.3d at 179–80.

### 3. Certainty of conviction absent misconduct

The State presented strong evidence supporting the conviction. Matthew and Megan testified concerning their family's friendly relationship with Martinez and his family. Although the families were close, Matthew had developed concerns over the years, particularly after he learned that Martinez took Megan to the Waller County ranch to ride horses with no other adults present and without Matthew's permission. A few years after that incident, Matthew and Laura reviewed their cell phone bill and discovered numerous calls and text messages between Megan and Martinez. When confronted about this, Megan disclosed that Martinez had sexually abused her.

Megan testified that she sometimes had a difficult relationship with Matthew, but Martinez would "be there for [her]" and would "be on [her] side." She also testified that Martinez sexually abused her on four occasions, including once at the Waller County ranch and three times at Martinez's house. Although she could not provide specific dates for any of these occasions, she described in detail what

happened, where in Martinez's house they were, and whether Michelle was home at the time.

In addition to Megan's testimony, the State also presented testimony from Alice and Crystal that Martinez had sexually abused them when they were children. The incidents involving Alice and Crystal involved some similarities to the incidents involving Megan. For example, Alice was a similar age to Megan at the time of the abuse, and she testified that the abuse occurred at a ranch. Both Alice and Crystal testified that on at least one occasion, other people were in the house at the time.

Martinez did present evidence contradicting the testimony of Megan, Alice, and Crystal. He presented evidence concerning his travel schedule, Megan's relationships with Michelle and his daughter Kristen, the layout of the relevant houses, his behavior with Megan during and after Bible study meetings, whether he kept a trailer at the Waller County property, and how sound traveled in the relevant houses. Although Michelle was an important witness for him, she was not the sole witness to testify on his behalf, and many of the topics that she testified about were also testified to by other defense witnesses, including witnesses who were not family members of Martinez.

When we consider the entire record, including the evidence supporting the conviction and the entirety of the closing arguments, we cannot conclude that the trial court abused its discretion by denying Martinez's motion for mistrial. *See*

*Archie*, 340 S.W.3d at 739; *Williams*, 417 S.W.3d at 175–76, 180–81. Although the State's comment was improper, the trial court gave multiple curative instructions throughout the closing argument reminding the jury that the attorneys' statements were argument, not evidence, and there is no indication that the jury ignored these instructions or ignored the court's instruction to disregard the specific comment at issue in this appeal. *See Williams*, 417 S.W.3d at 181. Because a reasonable trial court could have concluded that its instructions cured any prejudice caused by the State's argument, we hold that the trial court did not abuse its discretion by denying the motion for mistrial. *See id.* at 180–81 ("Our task is not to determine whether we disagree with the trial court's ruling, but whether the trial court's determination was beyond the zone of reasonable disagreement.").

We overrule Martinez's third issue.

## Denial of Challenges for Cause

In his fourth issue, Martinez contends that the trial court erred by denying four challenges for cause made after the prospective jurors stated during voir dire that they could not consider probation in a sexual assault of a child case.

A prospective juror can be challenged for cause by the defendant if he has a bias or prejudice "against any of the law applicable to the case upon which the defense is entitled to rely." TEX. CODE CRIM. PROC. art. 35.16(c)(2); *Comeaux v. State*, 445 S.W.3d 745, 749 (Tex. Crim. App. 2014). The trial court must excuse the

33

prospective juror if bias or prejudice would impair the juror's ability to carry out his oath and instructions in accordance with the law. *Comeaux*, 445 S.W.3d at 749. Before the court excuses the prospective juror, the law must be explained to him and the defendant must show that the prospective juror "understood the law and still could not overcome his prejudice." *Id.* When the trial court denies a valid challenge for cause—thus forcing the defendant to use a peremptory strike on a venire member who should have been removed—the defendant is harmed if he would have used that peremptory strike on another objectionable juror. *Id.* at 750.

"Both the State and defense are entitled to jurors who can consider the entire range of punishment for the particular statutory offense—*i.e.,* from the maximum to the minimum and all points in between." *Cardenas v. State*, 325 S.W.3d 179, 184 (Tex. Crim. App. 2010). Jurors must be able to consider both a situation in which the minimum punishment is appropriate and a situation in which the maximum punishment would be appropriate. *Id.* "A question committing a juror to consider the minimum punishment is both proper and permissible." *Id.* However, if counsel "attempts to commit a veniremember to consider the minimum sentence based on specific evidentiary facts," counsel asks an improper commitment question. *Id.*

A juror who states that he cannot consider the minimum punishment for a particular offense is subject to a challenge for cause. *Id.* at 185. Either the opposing party or the trial court may "examine the juror further to ensure that he fully

understands and appreciates the position that he is taking, but unless there is further clarification or vacillation by the juror," the trial court must grant a challenge for cause if the juror states that he cannot consider the full range of punishment. *Id.*; *Moore v. State*, 999 S.W.2d 385, 400 (Tex. Crim. App. 1999) ("When the record reflects that a venireman vacillates or equivocates on his ability to follow the law, the reviewing court must defer to the trial court.").

During voir dire, the trial court informed the venire that the punishment range for sexual assault of a child, a second-degree felony, was from probation to twenty years' confinement. The court emphasized that the punishment range is wide because "[w]e don't know how these things can happen in certain cases," and probation may be an appropriate punishment in one case, but a twenty-year sentence may be appropriate in another case. The court asked:

> Now, the question about the low end. We're talking about the low end. Because it's a second-degree felony and the State Legislature has given us a wide range of punishment, you have to be fair and consider it. You cannot say, "I'm not going to consider it," because you're not being fair. So the question is: Can—how many persons just cannot consider whether probation is appropriate in a sexual assault case of a child, just can't even consider it? Not give. When I say "consider," go in the jury room and say, "Hm, based on what I heard, is probation appropriate"?

Several prospective jurors raised their hands, including prospective jurors 20, 48, 50, and 55. When specifically asked by the trial court, each of these jurors responded that they would not consider probation.

35

During its portion of voir dire, the State presented the following hypothetical in an attempt to rehabilitate the prospective jurors on this matter:

> Now, Judge Jones asked everyone a little bit ago whether they could consider the full range of punishment and asked everyone to raise their hand if they could not consider the lower range of punishment or the upper range, including probation. All we're asking is whether you can keep an open mind going into this trial and say that you can follow the law and simply consider the full range of punishment. We're not asking you to give it. We're asking you to consider. Just keep an open mind. Considering might just mean thinking—considering it for five seconds and moving on and saying, "No, probation is not appropriate in this case now that I've heard all of the evidence."
>
> All we're asking is, you can't go into the trial before you've heard any evidence and say, "I don't care what I hear at this trial, I'm never giving probation." And to give a hypothetical, there are cases sometimes where even our office will offer a probation to someone that is charged with sexual assault of a child. That might sound strange, but here's a hypothetical for you. And you might not agree with it, but it's just a hypothetical. A 16-year-old and a 20-year-old fall madly in love[8] . . . with each other. Their parents didn't know about it, but the 20-year-old male takes care of that 16-year-old. He never abuses her in terms—legally, it may be considered abuse because they wind up having sex one night, but it was consensual. The 16-year-old never feels forced or threatened by this 20-year-old. She winds up getting pregnant and they wind up getting married.
>
> And when the parents find out about this child that she has, they get upset, and they call the police and charges are filed because a 20-year-old cannot have sex with a 16-year-old under the law. This 20-year-old is a pillar of his community. He gives to charity, he's never been in trouble, he doesn't do drugs, he's going to school, he's doing all the right things. He slipped up and didn't necessarily do things the right way under what the law says.

---

[8] At this point, defense counsel objected on the basis that the State was asking an "[i]mproper commitment question, trying to give the jury a specific fact situation." The trial court overruled the objection.

Can everyone see a situation where you might consider, consider, probation in a case like that? Okay. So that's my point. We're saying you don't know the facts of this case yet. All you know is that we're alleging there's a victim under the age of 17, a person under the age of 17. But without knowing all the facts, we're just asking you to not close off your mind so that we can have a fair jury.

The State then directed its questioning to the prospective jurors who had indicated that they could not consider probation and asked, "So with that in mind . . . does that change your answer at all to whether you could consider probation?" Several of the prospective jurors responded that they had not changed their minds, but the State had the following exchanges with prospective jurors 20, 48, 50, and 55:

| | |
|---|---|
| The State: | Okay. Juror 20? |
| Juror 20: | Yes. |
| The State: | Okay. So Juror 20, you're saying you would at least be able to go into the trial with an open mind and consider the full range not knowing the evidence yet? |
| Juror 20: | Yes. |
| . . . . | |
| The State: | Juror 48? |
| Juror 48: | Yes. |
| The State: | Thank you, sir. Are you able to consider the full range of punishment? |
| Juror 48: | Yes. |
| The State: | Juror 50? |
| Juror 50: | Based on what you described, yes. |

The State:    Thank you, sir. Juror 55?

Juror 55:    Yes.

The State:    You are able to consider the full range?

Juror 55:    Yes.

After voir dire concluded, defense counsel challenged prospective jurors 20, 48, 50, and 55 for cause. The trial court denied each of these challenges, noting that the four prospective jurors had been rehabilitated on whether they could consider probation.[9] After the jury was selected, the trial court asked whether there were any objections to the seating of the jury. Defense counsel requested additional peremptory challenges, stating that he had to use peremptory challenges against prospective jurors 20, 48, 50, and 55 instead of against other objectionable members of the venire who ended up on the jury. The trial court denied this request.

To the extent Martinez argues on appeal that the trial court improperly attempted to rehabilitate the prospective jurors who had stated that they could not consider probation as punishment in a sexual assault of a child case, we note that the Court of Criminal Appeals has held that when a prospective juror states that he

---

[9]    After defense counsel challenged prospective juror 20 for cause, the parties and the trial court discussed the propriety of the State's hypothetical and whether the prospective jurors expressed an ability to consider probation only in the factual scenario described in the hypothetical. The trial court stated: "I understand your argument, [defense counsel], but that's not how I understood their responses, to be limited to that particular hypothetical situation, but that it would open their minds that there could be a set of different circumstances to allow them to say, 'Now I can keep an open mind and consider the full range, it depends on the evidence, I need to wait and hear that,' is what I heard."

cannot consider the minimum punishment for a particular offense, "[t]he opposing party *or trial judge* may then examine the juror further to ensure that he fully understands and appreciates the position that he is taking." *See Cardenas*, 325 S.W.3d at 185 (emphasis added); *see also Gardner v. State*, 733 S.W.2d 195, 210 (Tex. Crim. App. 1987) (stating that trial court's intervention in voir dire proceedings is "[u]sually . . . warranted for purposes of clarification and expedition," and trial court's comments during voir dire constitute reversible error only when comments "are reasonably calculated to benefit the State or prejudice the defendant's rights"). Thus, the trial court may permissibly play a role in ensuring that prospective jurors understand the law.

Martinez also argues that the hypothetical used by the State was inappropriate and "improperly committed [the prospective jurors] to a pie-in-the-sky set of facts." The law "allows the use of a hypothetical to ascertain the views of the prospective jurors on issues pertinent to a fair determination of the case." *Atkins v. State*, 951 S.W.2d 787, 789 (Tex. Crim. App. 1997). However, using hypotheticals is only proper to explain the law; parties may not use hypotheticals to "commit the jurors to particular circumstances." *Id.*; *see Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001) ("[A]n attorney cannot attempt to bind or commit a prospective juror to a verdict based on a hypothetical set of facts.") (quotations omitted). Because jurors must be able to consider the full range of punishment, parties "may commit

39

jurors to consider the entire range of punishment for the statutory offense." *Cardenas*, 325 S.W.3d at 184; *Standefer*, 59 S.W.3d at 181 (stating that questions concerning juror's ability to consider full range of punishment are commitment questions "but are nevertheless proper"). Although a "question committing a juror to consider the minimum punishment is both proper and permissible," counsel may not "commit a veniremember to consider the minimum sentence based on specific evidentiary facts." *Cardenas*, 325 S.W.3d at 184.

Here, the State informed the venire that there are some factual situations in which even it will offer probation to someone charged with sexual assault of a child. The State then presented a hypothetical that contained specific facts, albeit not a factual scenario analogous to this case. At the end of the hypothetical, the prosecutor stated:

> Can everyone see a situation where you might consider, consider, probation in a case like that? Okay. So that's my point. We're saying you don't know the facts of this case yet. All you know is that we're alleging there's a victim under the age of 17, a person under the age of 17. But without knowing all the facts, we're just asking you to not close off your mind so that we can have a fair jury.

The State then asked, "So with that in mind . . . does that change your answer at all to whether you could consider probation?" Prospective jurors 20, 48, 50, and 55 answered that they could consider the full range of punishment.

Although the State's hypothetical contained "specific evidentiary facts," the State did not ask the prospective jurors whether they could consider probation *in that*

*factual scenario*. Instead, the State used the hypothetical as an example of a situation where considering probation might be an appropriate punishment and emphasized that the prospective jurors "don't know the facts of this case yet." The State then asked prospective jurors if their answer had changed on whether they could consider probation. We conclude that the State's hypothetical question did not improperly commit prospective jurors to "consider the minimum sentence based on specific evidentiary facts." *See id.*

Martinez also cites this Court's opinion in *Berwick v. Wagner* for the proposition that a prospective juror who is "unequivocally biased or prejudiced cannot revive his eligibility by recanting an earlier expression of bias or prejudice." *See* 509 S.W.3d 411, 422–23 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (quoting *Smith v. Dean*, 232 S.W.3d 181, 190 (Tex. App.—Fort Worth 2007, pet. denied)). He argues that because each prospective juror "expressed his bias and prejudice and unequivocally stated he could not be fair," it was thus "improper for the trial court to attempt to revive his eligibility." However, the Court of Criminal Appeals has allowed parties to try to rehabilitate a prospective juror that has expressed a bias against a phase of the law, such as by stating that he cannot consider the full range of punishment. *See, e.g.*, *Cardenas*, 325 S.W.3d at 185 ("The opposing party or trial judge may then examine the juror further to ensure that he fully understands and appreciates the position that he is taking, but unless there is further

clarification or vacillation by the juror, the trial judge must grant a challenge for cause if the juror states that he cannot consider the full range of punishment."); *Barefoot v. State*, 596 S.W.2d 875, 885–86 (Tex. Crim. App. 1980) (concluding that prospective juror was not challengeable for cause on basis that he could not give minimum punishment in murder case when, after rehabilitation by State, juror stated that he "could consider the minimum punishment in a proper case").

We conclude that the State properly rehabilitated prospective jurors 20, 48, 50, and 55, and we hold that the trial court did not err by denying Martinez's challenges for cause to these four prospective jurors.

We overrule Martinez's fourth issue.

### Speedy Trial

Finally, in his fifth issue, Martinez argues that he was denied his right to a speedy trial. He argues that he was indicted in October 2015 but the first attempt at selecting a jury did not occur until November 2021, more than six years later. He contends that the trial court erroneously denied his motion to dismiss the indictment.

### A. Governing Law

In all criminal prosecutions, both the state and federal constitutions guarantee the defendant the right to a speedy trial. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10; *State v. Lopez*, 631 S.W.3d 107, 113 (Tex. Crim. App. 2021). A speedy trial protects three interests of the defendant: freedom from oppressive pretrial

incarceration, mitigation of the anxiety and concern accompanying public accusation, and avoidance of impairment to the defendant's defense. *Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008).

In analyzing a speedy trial claim, we consider four factors: (1) the length of the delay; (2) the State's reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to the defense because of the length of delay. *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *Balderas v. State*, 517 S.W.3d 756, 767 (Tex. Crim. App. 2016). The State bears the burden of justifying the length of delay, but the defendant bears the burden of proving assertion of the right and showing prejudice. *Cantu*, 253 S.W.3d at 280; *State v. Moreno*, 651 S.W.3d 399, 407 (Tex. App.—Houston [1st Dist.] 2022, no pet.). The defendant's burden on the latter two factors "varies inversely" with the State's degree of culpability for the delay. *Cantu*, 253 S.W.3d at 280; *Moreno*, 651 S.W.3d at 407. "Thus, the greater the State's bad faith or official negligence and the longer its actions delay a trial, the less a defendant must show actual prejudice or prove diligence in asserting his right to a speedy trial." *Cantu*, 253 S.W.3d at 280–81.

The analysis under *Barker* is triggered by a delay that is unreasonable enough to be "presumptively prejudicial." *Id.* at 281; *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992) (noting that, in this context, presumptive prejudice "does not necessarily indicate a statistical probability of prejudice; it simply marks the point at

which courts deem the delay unreasonable enough to trigger the *Barker* enquiry"). Although there is no set length of delay which triggers the *Barker* analysis, courts have generally held that delays approaching one year are unreasonable enough. *Balderas*, 517 S.W.3d at 768; *Cantu*, 253 S.W.3d at 281. The extent to which the delay exceeds the minimum amount of time needed to trigger the analysis "factors into our assessment of the first *Barker* factor." *Balderas*, 517 S.W.3d at 768; *see Dragoo v. State*, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003) (stating that because three-and-a-half-year delay between arrest and trial "stretched far beyond the minimum needed to trigger the enquiry," length of delay weighed heavily in favor of finding violation of right).

Once the *Barker* analysis is triggered, we must analyze the speedy trial claim by first weighing the strength of each factor and then balancing their relative weights in light of the conduct of both the prosecution and the defendant. *Cantu*, 253 S.W.3d at 281. No single factor is necessary or sufficient to establish a violation of the speedy trial right. *Dragoo*, 96 S.W.3d at 313. Instead, the factors are related, and we must consider them together "along with any other relevant circumstances." *Cantu*, 253 S.W.3d at 281. Because dismissal of the charging instrument is a "radical remedy," we must apply the *Barker* test "with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's

actual and asserted interest in a speedy trial has been infringed." *Id.* "The constitutional right is that of a speedy trial, not dismissal of the charges." *Id.*

We apply a bifurcated standard of review in addressing speedy trial claims. *Lopez*, 631 S.W.3d at 113–14. We give almost total deference to the trial court's historical fact findings that are supported by the record, and we draw reasonable inferences from those facts necessary to support the findings. *Balderas*, 517 S.W.3d at 767–68. When the trial court denies a speedy trial motion, we presume that the court resolved any disputed factual issues in favor of the State, and we defer to implied fact findings that are supported by the record. *Cantu*, 253 S.W.3d at 282. We should not consider record evidence that was not before the trial court when it made its ruling. *Balderas*, 517 S.W.3d at 768. Review of the individual *Barker* factors necessarily involves both fact determinations and legal conclusions, but "the balancing test as a whole is a purely legal question that we review *de novo*." *Lopez*, 631 S.W.3d at 114; *Balderas*, 517 S.W.3d at 768.

## B. Analysis of Barker v. Wingo *Factors*

### 1. Length of delay

Martinez was arrested in April 2015 and indicted in October 2015. He moved to dismiss the charges against him in October 2021. This delay was six years from the date of indictment and six-and-a-half years from the date of arrest. *See Gonzales v. State*, 435 S.W.3d 801, 809 (Tex. Crim. App. 2014) ("The length of the delay is

measured from the time the accused is arrested or formally accused."). Both parties agree that the length of the delay is enough to trigger the analysis under *Barker*. *See Balderas*, 517 S.W.3d at 768 ("In general, courts deem delay approaching one year to be unreasonable enough to trigger the *Barker* enquiry.") (quotations omitted). Moreover, because this delay "stretched far beyond the minimum needed to trigger the inquiry," this first factor "weighs heavily in favor of" finding that a violation of Martinez's speedy-trial right occurred. *See id.*; *Dragoo*, 96 S.W.3d at 314; *see also Zamorano v. State*, 84 S.W.3d 643, 649 (Tex. Crim. App. 2002) ("[A]ny speedy trial analysis depends first upon whether the delay is more than 'ordinary'; if so, the longer the delay beyond that which is ordinary, the more prejudicial that delay is to the defendant.").

### 2. State's reason for the delay

We assign different weights to different reasons the State provides to justify the delay. *Balderas*, 517 S.W.3d at 768; *Dragoo*, 96 S.W.3d at 314; *Zamorano*, 84 S.W.3d at 649. "Some reasons are valid and serve to justify an appropriate delay." *Balderas*, 517 S.W.3d at 768; *Gonzales*, 435 S.W.3d at 810 ("Unjustifiable reasons for delay count towards the 'length of delay,' while justifiable reasons for delay do not."); *Ussery v. State*, 596 S.W.3d 277, 285 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd) ("A valid delay should not weigh against the State at all.") (quotations omitted).

A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Barker*, 407 U.S. at 531. We must consider whether the government or the defendant "is more to blame for the delay," and delay caused by either the defendant or his counsel weighs against the defendant. *Balderas*, 517 S.W.3d at 768 (alterations and internal quotations omitted); *State v. Davis*, 549 S.W.3d 688, 699 (Tex. App.—Austin 2017, no pet.) ("Delay caused by the defendant or his counsel weighs against the defendant. Delay caused by law enforcement or the prosecution weighs against the State.") (citations omitted). "In the absence of an assigned reason for the delay, a court may presume neither a deliberate attempt on the part of the State to prejudice the defense nor a valid reason for the delay." *Dragoo*, 96 S.W.3d at 314.

On appeal, Martinez acknowledges that "[n]othing in the record suggests that the prosecutor deliberately tried to delay the trial to gain any tactical advantage." He argues that, nevertheless, "the State still caused significant delays."

The Harris County District Attorney's Office filed a criminal complaint against Martinez on April 16, 2015. It is unknown when Martinez was arrested, but he posted bond on April 20, 2015, and the trial court placed him on pretrial supervision. A grand jury indicted Martinez for two counts of sexual assault of a

child against Megan on October 13, 2015. A grand jury also indicted Martinez for sexual assault of a disabled person against Megan's sister Katherine in January 2016. The charge against Katherine was not tried in the underlying proceeding.

The appellate record contains little documentation of what occurred in the case throughout the end of 2015, 2016, and the beginning of 2017. The trial court ordered Martinez to submit to DNA testing in October 2015, ordered him to submit to HIV testing in December 2015, and granted him permission to travel outside of Harris County in December 2015, June and July 2016, October and November 2016, and April 2017.

In June 2017, Martinez moved for a continuance, arguing that the State had not provided him with a copy of Katherine's statement, and questions had arisen involving Katherine's competency, which required expert evaluation.[10] The trial court granted this motion. The trial court's docket sheet reflects that during the period between indictment and the granting of the June 2017 motion for continuance, the case was reset eight times on Martinez's request, twice by the court, and once on the agreement of both parties. The "case reset forms" corresponding to these resets are not included in the appellate record.

---

[10]    The State notified Martinez that it intended to use hearsay statements by Katherine as extraneous offense evidence in the underlying proceeding involving the charges against Megan. Ultimately, however, Katherine did not testify, and the jury did not hear any evidence that Martinez had allegedly sexually abused her.

In August 2017, Hurricane Harvey hit the Houston area, causing widespread flooding, property damage, and significant disruption to court operations in Harris County. In the year following Hurricane Harvey, the case was reset an additional seven times. The docket sheet reflects that five of these resets occurred with the agreement of both parties, and two resets were by the court. Two of the "case reset forms" for these resets are contained in the appellate record. On March 26, 2018, the case was reset until April 5, 2018. On the portion of the form stating "Reset by," boxes are checked next to "Court" and "Defense." The form also notes that "[defense attorney] arguing before [court of appeals] in Brazoria County." The docket sheet entry for this date states, "Reset By Agreement Of Both Parties, 4/05/2018 09:00 AM Pre-Trial Motions." On April 5, 2018, the case was reset for a suppression hearing on September 21, 2018, and a jury trial on October 22, 2018. The "Reset by" portion of the case reset form again has check marks next to "Court" and Defense," and the docket sheet again states that the case was "Reset By Agreement Of Both Parties."

In September 2017, Megan was charged with an offense in Fort Bend County. In October 2018, the State provided two *Brady* notifications, informing Martinez that (1) Megan had been charged with an offense; (2) her bond for that pending

49

charged had been revoked because she cut off her ankle monitor and absconded;[11] and (3) Sweeney believed that Megan had lied under oath during a bond hearing for her husband. Around the same time that the State provided these notifications, and shortly before the October 22, 2018 trial setting, Martinez filed a motion for production of evidence, seeking information concerning Katherine's competency. Martinez also moved for a continuance based on the need to investigate the charges against Megan. Martinez requested that the State produce recordings of phone calls between Megan and her husband while her husband was in jail. The trial court granted the motion for continuance and the motion requiring the State to produce the jail call recordings and evidence relating to Megan's criminal charge. The case was then reset for a pretrial hearing on February 15, 2019, and a jury trial on March 25, 2019.

The case was reset four more times throughout 2019 and early 2020. On each occasion, the case reset form indicated that the case was reset by "Court" and "Defense." The docket sheet states that three of these resets were "By Agreement Of Both Parties," and one reset was by the court. The last of these resets, approved on January 6, 2020, reset the case for trial on May 4, 2020.

---

[11] The record does not indicate when the State made contact again with Megan after she absconded, but Martinez represents that Megan's whereabouts were unknown for around a year and a half.

In March 2020, the COVID-19 pandemic began and caused significant disruption to the judicial system, with nearly all jury trials delayed for months throughout the state. On October 5, 2020, the case was reset for trial on January 11, 2021. The reset form stated that the case was reset by "Defense." Although the record contains no form resetting the case from January 11, 2021, to a later date, it is undisputed that trial did not occur on this date. On February 4, 2021, Martinez filed an unopposed motion for continuance, arguing that his daughter Kristen, "a material witness in this cause," was working as a nurse for COVID patients in El Paso and could not travel to Houston for trial. The trial court granted the motion for continuance, and the case was reset for trial on August 16, 2021.

On July 7, 2021, the State and Martinez filed a joint motion for continuance. The prosecutor informed the court that his wife was scheduled to give birth ten days before the August trial setting, and defense counsel informed the court that, in reliance on the prosecutor's conflict, he had agreed to assist in the care of his young grandchildren during the week of the trial setting. The trial court granted the joint motion and reset the trial for October 18, 2021.

Four days before the October 18, 2021 trial setting, Martinez again moved for a continuance. Defense counsel argued that a continuance was necessary because he had had surgery in September 2021 and was not yet physically able to participate in a jury trial; arrangements needed to be made for Kristen, who lived in Arizona and

was undergoing a high-risk pregnancy, to travel to Houston; and counsel had an appellate argument scheduled in Eastland. The trial court granted the motion and reset the case for a pretrial hearing on October 29, 2021, and a jury trial on November 15, 2021. Martinez moved to dismiss the indictment on speedy trial grounds on October 28, 2021, the day before the scheduled pretrial hearing.

At the speedy trial hearing and on appeal, Martinez argues that some of the delays were attributable to the State, specifically delay relating to the charge involving Katherine. He argues that the State intended to use that case as an extraneous offense in the underlying proceeding, but the State allegedly did not provide Martinez with a copy of Katherine's statement—requiring Martinez to move for a continuance in June 2017—and did not comply with other discovery requests concerning Katherine's competency—requiring Martinez to file a motion for production of evidence in October 2018. As further evidence of delay caused by the State, Martinez points to Megan's pending criminal charge in 2017 and 2018. At some point while that charge was pending, Megan severed her ankle monitor and absconded, leaving her whereabouts unknown to the State for nearly a year-and-a-half. In October 2018, Martinez filed a motion for production, seeking information concerning the pending charge against Megan as well as recordings of jail calls involving Megan and her husband, and a motion for continuance. The trial court granted this motion for continuance.

The trial court did not make written findings concerning Martinez's speedy-trial motion. However, the court stated on the record that it did not believe that any delay caused by researching Katherine's competency, trying to determine whether she qualified as a disabled person, and reviewing over 300 jail calls between Megan and her husband raised a speedy-trial concern.

To the extent the State delayed in producing Katherine's statement and evidence concerning her competency, such as information concerning what testing had been done with Katherine and the results of those tests, there is no evidence that any delay was deliberate or the result of bad faith. *See Richardson v. State*, 631 S.W.3d 269, 276 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd). Thus, at most, this delay weighs slightly against the State. *See id.* However, with respect to the delay caused by the production and review of the jail calls between Megan and her husband, this was a discovery request initiated by Martinez, and this delay is more appropriately attributable to the defense, and not to the State. *See Davis*, 549 S.W.3d at 703 (balancing delay from State's motion for continuance for completion of DNA testing against defense's initiation of request for DNA testing, benefit of having testing, and court's decision to have "everything tested for DNA" before retrial of defendant). Additionally, Megan absconded while on bail for a pending charge, and the State was unable to locate her for approximately eighteen months. A "missing

witness" is a "valid reason" that "should serve to justify appropriate delay." *Gonzales*, 435 S.W.3d at 809–10 (quotations omitted).

The appellate record reflects that Martinez filed several motions for continuance throughout the case, including a motion for continuance mere weeks before filing his motion to dismiss, and the case reset forms and the trial court's docket sheet reflect that numerous resets were made at Martinez's request. These delays were attributable to Martinez. *See Laird v. State*, —S.W.3d—, No. 03-21-00631-CR, 2023 WL 8852509, at *5–6 (Tex. App.—Austin Dec. 22, 2023, pet. ref'd); *see also Shaw v. State*, 117 S.W.3d 883, 889 (Tex. Crim. App. 2003) ("[G]iven defense counsel's statements to the trial court regarding [the defendant's] motions for continuance, the trial court could have reasonably concluded that [the defendant] himself was responsible for several months of the delay."); *Cavitt v. State*, 507 S.W.3d 235, 245 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (considering that trial court's docket sheet indicated that trial had been "reset by agreement of both parties" and indicated that "several of the previous resets were done at defendant's request" and concluding that "the record evidence about who was responsible for the trial delay is at best neutral").

Martinez also acknowledges that two "major catastrophes" contributed to the delay of his trial: Hurricane Harvey and the COVID-19 pandemic. In conducting a speedy trial analysis, this Court has concluded that the disruption to the Harris

County court system caused by Hurricane Harvey was a valid reason that justified delay. *See Ussery*, 596 S.W.3d at 286 (noting that damage from Hurricane Harvey was valid reason for delay which should not weigh against State). Our sister intermediate appellate courts have not reached a uniform conclusion concerning whether delays caused by the pandemic should weigh against the State or be neutral, but courts reasoning that the delay should weigh against the State have concluded that this delay should not weigh heavily. *See, e.g.*, *Laird*, 2023 WL 8852509, at *5 ("To the extent that the pandemic and related court closures weigh against the State, they do so but slightly."); *see also State v. Conatser*, 645 S.W.3d 925, 930 (Tex. App.—Dallas 2022, no pet.) ("Delay caused by the onset of a pandemic cannot be attributed as fault to the State.").

In sum, there were multiple periods of delay throughout this case with multiple causes. There is evidence that the State delayed in producing Katherine's statement and evidence concerning her competency, although there was no evidence that this delay was done deliberately or in bad faith. There is also evidence that the defense contributed to several periods of delay by filing motions for continuances, requesting resets of the trial setting, and requesting and reviewing jail calls between Megan and her husband. Finally, there is evidence that delay was caused by factors outside the control of all parties and the trial court: Hurricane Harvey and the pandemic. We therefore conclude that this factor is neutral.

### 3. Defendant's assertion of his right to speedy trial

Although the defendant "has no duty to bring himself to trial," as that is the State's duty, the defendant does have the responsibility to assert his right to a speedy trial. *Cantu*, 253 S.W.3d at 282. This factor is "closely related" to the other three *Barker* factors "because the strength of his efforts will be shaped by them," that is, "[t]he more serious the deprivation, the more likely a defendant is to complain." *Id.* at 282–83 (quoting *Barker*, 407 U.S. at 531). Thus, the defendant's assertion of his right to speedy trial—or his failure to assert the right—is "entitled to strong evidentiary weight in determining whether the defendant has been deprived of that right." *Balderas*, 517 S.W.3d at 771; *Cantu*, 253 S.W.3d at 283.

A defendant's lack of a timely demand for a speedy trial "indicates strongly that he did not really want one." *Balderas*, 517 S.W.3d at 771. The longer a delay becomes, "the more likely a defendant who wished a speedy trial would be to take some action to obtain it." *Dragoo*, 96 S.W.3d at 314 (quotations omitted). Thus, "inaction weighs more heavily against a violation the longer the delay becomes." *Balderas*, 517 S.W.3d at 771 (quoting *Dragoo*, 96 S.W.3d at 314). We also must consider how the defendant asserts the speedy trial right. Moving for dismissal of the charging instrument instead of a speedy trial "will generally weaken a speedy-trial claim because it shows a desire to have no trial instead of a speedy one." *Cantu*, 253 S.W.3d at 283. If a defendant fails to seek a speedy trial before moving for

56

dismissal of the charges, "he should provide cogent reasons for this failure." *Id.* Repeated requests for a speedy trial "weigh heavily in favor of the defendant," but the failure to make such requests "supports an inference that the defendant does not really want a trial, he wants only a dismissal." *Id.*

Four days prior to the October 18, 2021 trial setting, Martinez moved for a continuance. The trial court granted the continuance, and the case was reset for a pretrial hearing on October 29, 2021, and set for trial on November 15, 2021. On October 28, 2021, Martinez filed a motion to dismiss the indictments on speedy trial grounds. Martinez sought dismissal of the charges with prejudice. There is no indication in the appellate record that Martinez asserted his speedy-trial right on any other occasion.[12]

The indictment against Martinez was pending for more than six years before he asserted his right to a speedy trial. This length of delay in asserting the right to a speedy trial "indicates strongly that [Martinez] did not really want" a speedy trial. *See Balderas*, 517 S.W.3d at 771; *Dragoo*, 96 S.W.3d at 314 ("[T]he longer delay becomes, the more likely a defendant who wished a speedy trial would be to take

---

[12]    On appeal, Martinez argues that he asserted his speedy trial right via his trial counsel, who "showed his eagerness to move the trial schedule along by aggressively pursuing discovery," including by "fil[ing] no less than three motions for production of evidence." Martinez cites no authority for the proposition that defense counsel's attempts to obtain discovery constitute an assertion of the right to speedy trial.

some action to obtain it.") (quotations omitted). Moreover, when Martinez asserted his right to a speedy trial in late October 2021, the case was set for trial mere weeks later in mid-November. Martinez also did not request a speedy trial; instead, he moved for dismissal of the indictment. This action weakens Martinez's speedy trial claim "because it shows a desire to have no trial instead of a speedy one." *See Cantu*, 253 S.W.3d at 283. We conclude that this factor weighs in favor of the State. *See Balderas*, 517 S.W.3d at 771; *Cantu*, 253 S.W.3d at 283.

### 4. Prejudice to defendant because of length of delay

Pretrial delay "is often both inevitable and wholly justifiable," so we must examine "whether and to what extent the delay has prejudiced the defendant." *Cantu*, 253 S.W.3d at 285 (quoting *Doggett*, 505 U.S. at 656). We analyze prejudice in light of the three interests that the speedy-trial right was designed to protect: (1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired. *Balderas*, 517 S.W.3d at 772. The third interest "is the most important because the fairness of the criminal-justice system is distorted when a defendant is unable to adequately prepare his defense." *Id.*; *Cantu*, 253 S.W.3d at 285. The defendant bears the burden to make "some showing of prejudice," but he need not show "actual prejudice." *Balderas*, 517 S.W.3d at 772. "Conclusory assertions are

58

not sufficient to carry a defendant's burden to show that he was prejudiced by delay." *Ussery*, 596 S.W.3d at 289.

We note that "[e]xcessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or identify." *Balderas*, 517 S.W.3d at 772; *Gonzales*, 435 S.W.3d at 812; *see also Doggett*, 505 U.S. at 652 ("[T]he presumption that pretrial delay has prejudiced the accused intensifies over time."). "In such instances, the defendant is absolved from the requirement to demonstrate prejudice." *Gonzales*, 435 S.W.3d at 812; *see Doggett*, 505 U.S. at 655–56 ("While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria, it is part of the mix of relevant facts, and its importance increases with the length of delay.") (internal citation omitted). However, the "presumption of prejudice is extenuated by the defendant's acquiescence in the delay." *Dragoo*, 96 S.W.3d at 315 (alterations and internal quotations omitted); *see Gonzales*, 435 S.W.3d at 815 ("When a defendant has timely asserted his right to a speedy trial, it is a difficult task for the State to prove that the defendant acquiesced in the delay.").

In his motion to dismiss, Martinez relied almost entirely on the presumption of prejudice caused by the six-year delay between indictment and his assertion of the speedy trial right in his motion. Martinez attached no evidence to his motion, but he did argue that "[t]here are no actual dates for the alleged offenses" and he "has

attempted to use debit cards and travel records to attempt to reconstruct a three year time period three years after the events." During a hearing on several pre-trial motions, the trial court addressed Martinez's motion to dismiss and admitted two exhibits: a timeline of relevant events following Martinez's indictment and records from Fort Bend County relating to Megan's 2017 arrest. The court also took judicial notice of its file. No witness testified during the speedy-trial portion of this pretrial hearing, and defense counsel did not make any specific arguments about prejudice.

On appeal, Martinez again relies upon the presumption of prejudice resulting from the lengthy delay before trial. He also argues that "[t]he effect of such a delay on witness's memories was keenly felt in this trial," noting that both Megan and Matthew repeatedly stated during their testimony that they could not recall certain information. Martinez argues that the citations that he provided for these instances "serve as examples and are by no means an exhaustive list of the time when these key witnesses could not provide information to the jury due to memory problems caused, at least in part, by the length of time between the events in question and the trial." Martinez does not point to any instances in which defense witnesses were unable to recall specific events. *See Barker*, 407 U.S. at 521 ("Delay is not an uncommon defense tactic. As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes

60

seriously so. And it is the prosecution which carries the burden of proof."); *Rivera v. State*, 990 S.W.2d 882, 892 (Tex. App.—Austin 1999, pet. ref'd) ("The unavailability of some witnesses and forgetfulness of others could, of course, benefit [the defendant] by weakening the State's case. Time can damage either side's case, and it is often impossible to determine which side has been prejudiced more severely.").

Martinez also does not make any arguments concerning the other interests that the speedy-trial right was designed to protect: preventing oppressive pretrial incarceration and minimizing the anxiety and concern of the accused. *See Balderas*, 517 S.W.3d at 772. The appellate record reflects that the complaint was filed against Martinez on April 16, 2015, and his bail was approved on April 20, 2015. Although Martinez's bail was revoked at least twice, the record indicates that bail was reinstated almost immediately each time, and therefore Martinez spent nearly all, if not all, of the pendency of the case free from pretrial incarceration. The record also reflects that Martinez requested and received permission to travel throughout Texas and out of state—sometimes for lengthy periods of time—nine times throughout the pendency of the case.

Due to the length of delay in this case, a presumption of prejudice exists. *See id.* However, the "presumption of prejudice is extenuated by the defendant's acquiescence in the delay." *Dragoo*, 96 S.W.3d at 315 (alterations and internal

61

quotations omitted). As we have noted above, Martinez himself was responsible for significant portions of the delay by requesting multiple resets and filing several motions for continuance. The presumption of prejudice, therefore, has been rebutted. *See Hopper v. State*, 520 S.W.3d 915, 929 (Tex. Crim. App. 2017) ("Any presumptive prejudice due to the passage of time was extenuated by appellant's acquiescence in the delay and even further extenuated by appellant's failure to employ a remedy that would have guaranteed him a speedy trial."). Martinez has failed to demonstrate any prejudice as a result of the delay. Although he points to multiple instances where Megan and Matthew were unable to recall information, they were both witnesses for the prosecution. He points to no instances in which defense witnesses experienced similar memory recall problems. Furthermore, he presented no evidence in the trial court—and does not argue on appeal—that he suffered oppressive pretrial incarceration or any anxiety or concern beyond that typically experienced by a person facing criminal charges. We conclude that this factor weighs against Martinez.

### 5. Balancing of factors

Having analyzed each of the *Barker* factors, we now must balance them. *See Balderas*, 517 S.W.3d at 773. The length of the delay—six years between indictment and Martinez's assertion of the speedy trial right—weighs heavily in favor of finding a speedy trial violation. However, although at least part of the delay could be

attributed to the State, the defense also contributed to the delay by seeking resets and moving for continuances, and factors outside the control of both parties also contributed to the delay. This factor is neutral in the analysis. Next, Martinez waited six years to assert his right to a speedy trial, and he did so within weeks of a trial setting by seeking dismissal of the indictments against him. This factor weighs in favor of the State. Finally, Martinez's acquiescence in the delay rebutted any presumption of prejudice caused by the length of the delay, and he presented no evidence that his defense had been compromised by the delay or that he had suffered from oppressive pretrial incarceration or anything beyond minimal anxiety and concern. Upon balancing the *Barker* factors, we conclude that Martinez's right to a speedy trial was not violated. We hold that the trial court did not err by denying Martinez's motion to dismiss the indictments on speedy trial grounds.

We overrule Martinez's fifth issue.

## Conclusion

We affirm the judgments of the trial court.


April L. Farris
Justice

Panel consists of Chief Justice Adams and Justices Guerra and Farris.

Do not publish. TEX. R. APP. P. 47.2(b).